# Exhibit 1

ROLAND JOSEPH TROSCLAIR, JR.          :     29TH JUDICIAL DISTRICT COURT

v. NO.: 86,054 ; DIV. "____"
                                                  M. LAUREN LEMMON

MONSANTO COMPANY; MONSANTO          :     PARISH OF ST. CHARLES
COMPANY MANUFACTURING
FACILITY; XL BERMUDA, LTD.;          :
CATLIN INSURANCE SERVICES, INC.;
T.H.E. INSURANCE COMPANY;            :     STATE OF LOUISIANA
3M CATTLE COMPANY, LLC; and
RANDY JACOBS                         :

FILED: _____       :     _____
                                            DEPUTY CLERK OF COURT

*****************************************************************************

## PETITION FOR DAMAGES

The Petitioner, ROLAND JOSEPH TROSCLAIR, JR., appears now before the Court,

through undersigned counsel, and petitions the Court for recovery of the damages and for other

relief and remedies prayed for in this Petition on the following grounds:

## PARTIES

1.

Plaintiff in this action is the following:

ROLAND TROSCLAIR, JR., a natural person of full age and majority who resides and is

domiciled in St. Charles Parish, State of Louisiana.

Made Defendants herein are the following:

A. MONSANTO COMPANY ("MONSANTO"), a Delaware corporation with its
   headquarters and principal place of business in St. Louis, Missouri, registered and
   doing business in the State of Louisiana which may be served through its Agent for
   Service of Process, Corporation Service Company, 501 Louisiana Avenue, Baton
   Rouge, LA 70802;

B. MONSANTO COMPANY MANUFACTURING FACILITY, LULING,
   LOUISIANA ("LULING PLANT"), a manufacturing facility and principal business
   establishment doing business in the State of Louisiana located at Highway 18 River
   Road, Luling, LA 70070, which may be served through its Agent for Service of
   Process, Corporation Service Company, 501 Louisiana Avenue, Baton Rouge, LA
   70802;

C. XL BERMUDA, LTD. ("XL BERMUDA"), a foreign corporation engaged in the
   insurance business, not registered but doing business in the State of Louisiana, which
   may be served through the Louisiana Secretary of State, 8585 Archives Avenue, Baton
   Rouge, LA 70809;

D. CATLIN INSURANCE SERVICES, INC. ("CATLIN INSURANCE"), a Louisiana
   corporation engaged in the insurance business, registered and doing business in the
   State of Louisiana, which may be served through its Agent for Service of Process at
   CT Corporation Syste at 3867 Plaza Tower Drive, Baton Rouge, LA 70816;

E. T.H.E. INSURANCE COMPANY ("T.H.E. INSURANCE"), a Louisiana company
   engaged in the insurance business, registered and doing business in the State of

**Exhibit 1**

Louisiana, which may be served through its Agent for Service of Process at CT Corporation System at 3867 Plaza Tower Drive, Baton Rouge, LA 70816;

F. 3M CATTLE, L.L.C. ("3M Cattle"), a Louisiana limited liability company engaged in agricultural business, registered and doing business in the State of Louisiana, which may be served through its Agent for Service of Process, Courtney Mongrue, 208 St. Charles Boulevard, Luling, LA 70070; and

G. RANDY JACOBS, a natural person residing in the State of Louisiana and who may be served at his domicile at 800 Sugarhouse Road, Luling, LA 70070.

### JURISDICTION AND VENUE

2.

At all times relevant to this Petition, Monsanto was the entity that discovered the herbicidal properties of glyphosate and owns and operates a chemical plant in Luling, St. Charles Parish, Louisiana, which manufactured and/or manufactures both glyphosate, the active ingredient of Roundup® formulations, which contain the active ingredient glyphosate and surfactants and/or adjuvants such as Polyethoxlated tallow amine ("POEA"). On information and belief, important scientific, manufacturing, marketing, sales and other business decisions regarding glyphosate and/or Roundup® formulations were and are made from and in the State of Louisiana, and contributed to Monsanto's wrongdoing.

3.

At all times relevant hereto, Monsanto maintained offices in Louisiana and/or regularly solicited and transacted business in the State of Louisiana and in St. Charles Parish. In addition, Monsanto reasonably expected that its products containing glyphosate would be used or consumed in Louisiana and St. Charles Parish and/or reasonably expected that its actions would lead to its company's products being used or consumed in Louisiana and St. Charles Parish.

4.

At all times relevant to this Petition, Monsanto was engaged in the business of manufacturing, formulating, creating, developing, designing, testing, producing, labeling, researching, marketing, promoting, advertising, selling, supplying, packaging, inspecting, and/or distributing glyphosate and/or Roundup® within the State of Louisiana.

5.

At all relevant times to this Petition, Monsanto had, and continues to have, regular and systematic contact with and conducts business in and from the State of Louisiana, such that it has purposefully availed itself of the laws of the State and expects to both sue and be sued in Louisiana.

In the alternative, Monsanto's presence in the State of Louisiana satisfies the due process requirements for Louisiana courts to exercise jurisdiction over it.

6.

The causes of action herein related to or arose from Monsanto's Louisiana-based conduct.

7.

At all times relevant hereto, Luling Plant maintained offices and manufacturing facilities in St. Charles Parish, and/or regularly solicited and transacted business in St. Charles Parish and the State of Louisiana. In addition, Luling Plant reasonably expected that its products, glyphosate and/or Roundup® formulations, would be used in St. Charles Parish and Louisiana and/or reasonably expected that its actions would lead to its products being used or consumed in St. Charles Parish and Louisiana.

8.

At all times relevant to this Petition, Luling Plant was engaged in the business of manufacturing, formulating, creating, developing, designing, testing, producing, labeling, researching, marketing, promoting, advertising, selling, supplying, packaging, inspecting, and/or distributing glyphosate and/or Roundup® formulations within St. Charles Parish and the State of Louisiana.

9.

At all relevant times, Luling Plant had, and continues to have, regular and systematic contact with and conducts business in and from the State of Louisiana, such that it has purposefully availed itself of the laws of the State and expects to both sue and be sued in Louisiana. In the alternative, Luling Plant's presence in the State of Louisiana satisfies the due process requirements for Louisiana courts to exercise jurisdiction over it.

10.

The causes of action herein related to or arose from Luling Plant's Louisiana-based conduct.

11.

At all times relevant to this Petition, XL Bermuda provided excess liability insurance coverage to Monsanto under Policy Nos. XLRKS-02033, XLUMB-0233, and XLUMB-602764 for actions giving rise to the causes of action herein.

12.

At all times relevant to this Petition, Catlin Insurance is and/or was a subsidiary of XL Bermuda.

13.

At all times relevant to this Petition, T.H.E. Insurance is and/or was a subsidiary of XL Bermuda.

14.

It is the legislative intent of the State of Louisiana that polices of insurance are issued not only for the insured, but for the public at large.[1]

15.

At all times relevant to this Petition, 3M Cattle was a Louisiana limited liability company, operating an agricultural business in the State of Louisiana, Parish of St. Charles where Mr. Trosclair performed agricultural work on behalf of 3M Cattle.

16.

At all times relevant to this Petition, Randy Jacobs, upon information and belief, is and/or was an employee of and working at Luling Plant and domiciled in St. Charles Parish.

17.

Plaintiff has timely filed this lawsuit within one year of discovering his cause of action as defined and required by the Louisiana Civil Code.

18.

Venue in this Court is proper pursuant to La. C.C.P. Art. 42 inasmuch as: (1) Defendant 3M Cattle is a domestic limited liability company with its registered office in St. Charles Parish, Louisiana; (2) Defendant Randy Jacobs is domiciled in St. Charles Parish, Louisiana; and (3) Defendant Monsanto's Luling Plant's principal business establishment is domiciled in St. Charles Parish, Louisiana.

19.

XL Bermuda, Ltd., Catlin Insurance Services, Inc. and T.H.E. Insurance Company are engaged in the insurance business and are doing business in the State of Louisiana. Upon information and belief, XL Bermuda, Catlin Insurance Services, Inc. and T.H.E. Insurance Company provides/have provided insurance to Monsanto and Luling Plant which also includes

---

[1] LSA R.S. 22:1269, subpart D.

coverage for the actions of their employees and/or agents, and thus, are proper Defendants herein pursuant to Louisiana's Direct Action Statute La. R.S. 22: 1269.

20.

Pursuant to La. C.C.P. 2324 in actions alleging joint and several liability against two or more defendants, venue is proper if it is proper as to any of the defendants. In this case, Plaintiff alleges joint and several liability as to more than two defendants. The 29th Judicial District Court is the proper venue for one or more of these defendants. Therefore, venue is proper as to all defendants.

**PLAINTIFF'S INJURIES**

21.

Plaintiff Roland Trosclair, Jr. ("Mr. Trosclair") is a citizen of the State of Louisiana, and resides in St. Charles Parish, Louisiana. He was exposed to glyphosate and/or Roundup® formulations in St. Charles Parish, Louisiana. Mr. Trosclair was diagnosed with non-Hodgkin's lymphoma ("NHL") in June, 2015. Mr. Trosclair first learned that exposure to glyphosate and/or Roundup® formulations can cause NHL in 2018.

22.

Mr. Trosclair was first exposed to glyphosate and/or Roundup® formulations in 2012, when he began working on a farm owned by 3M Cattle in St. Charles Parish. Mr. Trosclair mixed concentrated Roundup® formulations which he regularly sprayed using a backpack sprayer until he became ill with NHL in 2015. Mr. Trosclair continued to be exposed to glyphosate and/or Roundup® formulations until 2018, when Mr. Trosclair learned glyphosate and/or Roundup® formulations were associated with NHL.

23.

On June 24, 2015, following MRI and CT scans, a biopsy diagnosed Mr. Trosclair with nodal marginal zone lymphoma Stage IV, a form of NHL. The diagnosis was confirmed with a bone marrow biopsy. A biopsy performed later that year following unsuccessful chemotherapy resulted in a diagnosis of small B-cell lymphoma. Since his diagnosis, Mr. Trosclair has suffered the effects attendant thereto, as a direct and proximate result of the unreasonable dangerous and defective nature of glyphosate and/or Roundup® formulations and Monsanto and Luling Plant's wrongful and negligent conduct in the manufacture, formulation, creation, development, design,

testing, production, labeling, research, marketing, promotion, advertise, sell, supplying, packaging, inspect, and/or distribution of glyphosate and/or Roundup® formulations.

24.

As a direct and proximate cause of these injuries, Mr. Trosclair has incurred and will continue to incur medical expenses in the future and has endured and will continue to endure pain and suffering and loss of enjoyment of life. Mr. Trosclair has otherwise been damaged in a personal and pecuniary nature.

25.

During the entire time Mr. Trosclair was exposed to glyphosate and/or Roundup® formulations®, he did not know that exposure to glyphosate and/or Roundup® formulations was injurious to his health or the health of others.

## BACKGROUND

26.

At all times relevant to this Petition, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup® formulation.

27.

At all times relevant to this Petition, Luling Plant has manufactured glyphosate and/or Roundup® formulations at the manufacturing facility in Luling, St. Charles Parish, Louisiana.

28.

Defendant Monsanto and Defendant Luling Plant have fraudulently manufactured, marketed, sold, and distributed a dangerous product to Louisiana citizens, including Mr. Trosclair.

29.

At all times relevant to this Petition, 3M Cattle has been a limited liability company in the State of Louisiana. 3M Cattle owns the farm where Mr. Trosclair sprayed glyphosate and/or Roundup® formulations from 2012 until 2018. 3M Cattle provided glyphosate and/or Roundup® formulation(s) and application equipment used by Mr. Trosclair to apply glyphosate and/or Roundup® formulation(s).

30.

**FAX MEMO**

Mr. Trosclair and/or 3M Cattle received glyphosate and/or Roundup® formulation(s) directly from Luling Plant. Containers filled with glyphosate and/or Roundup® formulation(s) were

provided to Mr. Trosclair and/or 3M Cattle by Mr. Randy Jacobs, an active Luling Plant employee, and/or others similarly situated.

## FACTS

31.

Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products. Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions, and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

32.

For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the World Health Organization ("WHO"), the main chemical ingredient of Roundup® — glyphosate—is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to glyphosate and/or Roundup® formulations such as employees in garden centers and nurseries and landscapers. Monsanto assured the public that glyphosate and/or Roundup® formulations were harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed the dangers of glyphosate and/or Roundup® formulations. Monsanto has led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that glyphosate and/or Roundup® formulations are safe.

### *The Discovery of Glyphosate and Development of Roundup®*

33.

In 1970, Defendant Monsanto discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. In addition to the active ingredient glyphosate, Roundup® formulations also contain adjuvants and other chemicals, such as the surfactant POEA, which are considered "inert" and therefore protected as "trade

secrets" in manufacturing.   In 2001, glyphosate was the most-used pesticide active ingredient in American agriculture with 85–90 million pounds used annually.  That number grew to 185 million pounds used in 2007.[2]  As of 2013, glyphosate was the world's most widely used herbicide.

34.

Upon information and belief, Monsanto's Roundup® products sold in the United States are manufactured domestically at Luling Plant and a manufacutring facility in Muscatine, Iowa.

**Registration of Herbicides under Federal Law**

35.

The manufacture, formulation, and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 *et seq.*  FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act.  7 U.S.C. § 136a(a).[3]

36.

In the case of glyphosate, the EPA had planned on releasing its preliminary risk assessment—in relation to the re-registration process—no later than July 2015.  The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings. In December 2017, the EPA released a draft risk assessment for glyphosate, allowing a comment period through April 30, 2018. The EPA is scheduled to publish the interim registration review decision for glyphosate in 2019.

**Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup®**

37.

Based on early studies showing that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E) in 1991.  In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not

FAX MEMO

---

[2] Arthur Grube et al., U.S. Environmental Protection Agency, *Pesticides Industry Sales and Usage, 2006–2007 Market Estimates* 14 (2011), *available at*
http://www.epa.gov/pesticides/pestsales/07pestsales/market_estimates2007.pdf.
[3] Registration by the EPA is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with *its label directions "will not generally cause unreasonable adverse effects on the environment."* 7 U.S.C. § 136a(c)(5)(D).

cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."[4]

38.

On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® formulations for registration purposes committed fraud.

39.

In the first instance, Monsanto, in seeking initial registration of Roundup® by the EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®.[5] IBT performed approximately 30 tests on glyphosate and glyphosate-containing products, including nine (9) of the 15 residue studies needed to register Roundup®.

40.

In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid.[6] An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."[7] Three top executives of IBT were convicted of fraud in 1983.

41.

In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner

---

[4] U.S. Envtl. Prot. Agency, *Memorandum, Subject: SECOND Peer Review of Glyphosate* 1 (1991), *available at* http://www.epa.gov/pesticides/chem_search/cleared_reviews/csr_PC-103601_30-Oct-91_265.pdf.
[5] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories* (Sep. 2, 2015), *available at* http://www.monsanto.com/products/documents/glyphosate-background-materials/ibt_craven_bkg.pdf.
[6] U.S. Envtl. Prot. Agency, *Summary of the IBT Review Program Office of Pesticide Programs* (1983), *available at* http://nepis.epa.gov/Exe/ZyNET.exe/91014ULV.TXT?ZyActionD=ZyDocument&Client=EPA&Index=1981+Thru +1985&Docs=&Query=&Time=&EndTime=&SearchMethod=1&TocRestrict=n&Toc=&TocEntry=&QField=&QF ieldYear=&QFieldMonth=&QFieldDay=&IntOFieldOp=0&ExtQFieldOp=0&XmlQuery=&File=D%3A%5Czyfiles %5CIndex%20Data%5C81thru85%5CTxt%5C00000022%5C91014ULV.txt&User=ANONYMOUS&Password=an onymous&SortMethod=h%7C- &MaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/r75g8/x150y150g16/i425&Display=p%7Cf&De fSeekPage=x&SearchBack=ZyActionL&Back=ZyActionS&BackDesc=Results%20page&MaximumPages=1&ZyE ntry=1&SeekPage=x&ZyPURL.
[7] Marie-Monique Robin, *The World According to Monsanto: Pollution, Corruption and the Control of the World's Food Supply* (2011) (*citing* U.S. Envtl. Prot. Agency, *Data Validation, Memo from K. Locke, Toxicology Branch, to R. Taylor, Registration Branch. Washington, D.C.* (August 9, 1978)).

of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.[8]

### The Importance of Roundup® to Monsanto's Market Dominance and Profits

42.

The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. With its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

43.

In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate, farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

44.

Through a three-pronged strategy of increasing production, decreasing prices, and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue.[9] Today, glyphosate remains one of the world's largest herbicides by sales volume.

### Monsanto has known for decades that it falsely advertises the safety of Roundup®

45.

In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides,

---

[8] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories, supra.*
[9] David Barboza, *The Power of Roundup: A Weed Killer Is A Block for Monsanto to Build On,* N.Y. Times, Aug. 2, 2001, *available at* http://www.nytimes.com/2001/08/02/business/the-power-of-roundup-a-weed-killer-is-a-block-for-monsanto-to-build-on.html.

including Roundup®, were "**safer than table salt**" and "**practically non-toxic**" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of glyphosate and/or Roundup® are the following:

a) "Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ..."

b) "And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem."

c) "Roundup biodegrades into naturally occurring elements."

d) "Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

e) "This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it."

f) Glyphosate is less toxic to rats than table salt following acute oral ingestion.

g) "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

h) "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish."

i) "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[10]

46.

On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a) Its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

\*   \*   \*

b) Its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable

\*   \*   \*

c) Its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

\*   \*   \*

---

[10] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

d) Its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

\* \* \*

e) Glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

\* \* \*

f) Its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

47.

In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."[11]

### Classifications and Assessments of Glyphosate

48.

On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the WHO, issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

49.

On July 29, 2015, the IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group ("WG") provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

50.

The IARC WG classified glyphosate as a Group 2A agent, which means that it is *probably carcinogenic to humans*. The IARC WG concluded the cancers most associated with glyphosate exposure are NHL and other hematopoietic cancers, including lymphocytic lymphoma, chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.[12]

51.

The IARC process for the classification of glyphosate followed the IARC's stringent procedures for the evaluation of a chemical agent. The established procedure for the IARC

---

[11] *Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.
[12] *See* Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate, supra.*

Monograph evaluations is described in the IARC Programme's Preamble.[13] Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

52.

One year before the Monograph Meeting, the Meeting is announced and there is a call for both data and experts. Eight months before the Meeting, the WG membership is selected and the sections of the Monograph are developed by the WG members. One month prior to the Meeting, the call for data is closed and the various draft sections are distributed among the WG members for review and comment. Finally, at the Meeting, the WG finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two (2) weeks after the Meeting, the summary of the WG findings is published in *The Lancet Oncology*, and within a year after the Meeting, the finalized Monograph is published.

53.

In assessing an agent, the IARC WG reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review.

54.

In March, 2015, the IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.[14]

55.

The assessment of the IARC WG identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

56.

The IARC WG also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

---

[13] World Health Org., *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Preamble*, (2006), *available at* http://monographs.iarc.fr/ENG/Preamble/CurrentPreamble.pdf.

[14] Categorization in Group 2A ("probably carcinogenic to humans") requires the IARC WG make "...at least *two of the following evaluations, including at least one* that involves either exposed humans or human cells or tissues: *limited evidence of carcinogenicity* in humans, *sufficient evidence of carcinogenicity* in experimental animals, [and/or] *strong evidence that the agent exhibits key characteristics of carcinogens.*" *Id.* at page 42.

57.

In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor: renal tubule carcinoma. A second study reported a positive trend for hemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

58.

The IARC WG further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

59.

Because of its rigorous scientific method and independence, the IARC is a widely respected organization and its findings are considered authoritative. Organizations such as the American Cancer Society and Federal Judicial Center hold the IARC in high esteem The Federal Judicial Center describes the IARC as "well-respected and prestigious" and notes that the IARC's assessment of carcinogenicity is "generally recognized as authoritative."[15] The U.S. Department of Labor's Occupational Safety and Health Administration also relies on the IARC assessments when requiring manufactures to warn of the potential carcinogenicity of chemicals.[16]

60.

Despite the IARC's impeccable reputation, on March 31, 2016, Monsanto's CEO falsely proclaimed to the public that glyphosate is not a carcinogen, disregarding the IARC's findings to the contrary.

61.

In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Monsanto's Roundup® formulations are more dangerous and toxic than glyphosate alone.[17] As early as 1991 evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.[18]

---

[15] Federal Judicial Ctr. "Reference Manual on Scientific Evidence." Washington, D.C. 20, 565 n. 46 (3d Ed. 2011).
[16] 29 C.F.R. § 1910.1200(d)(4) (2010). *California Chamber of Commerce v. Brown*, 196 Cal. App. 4th 233, 242, 126 Cal. Rptr. 3d 214, 219 (2011).
[17] Martinez, A., et al, *Cytotoxicity of the herbicide glyphosate in human peripheral blood mononuclear cells*, 27(4) BIOMEDICA 594-604 (2007); Nora Benachour, et al., *Glyphosate Formulations Induce Apoptosis and Necrosis in Human Umbilical, Embryonic and Placental Cells*, 22 CHEM. RES. TOXICOL. 97-105 (2008); Gasnier, C., et al, *Dig1 protects against cell death provoked by glyphosate-based herbicides in human liver cell lines*, 5:29 J OCCUP MED TOXICOL. (2010); Francisco Peixoto, *Comparative effects of the Roundup and Glyphosate on mitochondrial oxidative phosphorylation*, 61 CHEMOSPHERE 1115, 1122 (2005); Julie Marc, et al., *Glyphosate-based pesticides affect cell cycle regulation*, 96 BIOLOGY OF THE CELL 245, 245-249 (2004).
[18] T.T. Martinez and K. Brown, *Oral and pulmonary toxicology of the surfactant used in Roundup herbicide*, PROC. WEST. PHARMACOL. SOC. 34:43-46 (1991).

62.

A 2004 study finding a molecular link between glyphosate-based products and cell cycle dysregulation, noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell."[19] Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."[20]

63.

In 2005, a study by Francisco Peixoto, entitled "Comparative effects of the Roundup® and glyphosate on mitochondrial oxidative phosphorylation," demonstrated that Roundup®'s effects on rat liver mitochondria are far more toxic than equal concentrations of glyphosate alone. The Peixoto study suggested that the harmful effects of Roundup® on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup® formulation products.[21]

64.

The study used dilution levels of Roundup® and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed the adjuvants in Roundup® formulations are not "inert" and that Roundup® formulations are always more toxic than the active ingredient glyphosate.

65.

The results of these studies were confirmed in published peer-reviewed studies and were at all times available and/or known to Monsanto.

---

[19] Marc, et al. 2004.
[20] Molinari, M., *Cell cycle checkpoints and their inactivation in human cancer*, 33 CELL PROLIF. 261-274 (2010); Stewart, Z., et al, *Cell-cycle dysregulation and anticancer therapy*, 24 TRENDS PHARMACOLOGY SCIENCES 139-145 (2003).
[21] Peixoto 2005.

66.

Monsanto knew or should have known that Roundup® formulations are more toxic than glyphosate alone and that safety studies on Roundup formulations, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Mr. Trosclair from glyphosate and/or Roundup® formulations.

67.

Monsanto's chief toxicologist Donna Farmer has admitted that she cannot say that Roundup® does not cause cancer because Monsanto has not performed carcinogenicity studies with the formulated product Roundup®, the very product that caused Mr. Trosclair's NHL.[22] She further admitted that in the 35 years Monsanto has marketed Roundup® formulations to the public, Monsanto has conducted no chronic carcinogenicity studies on the formulated Roundup® product merely because EPA did not require such a study be performed for registration of glyphosate.[23]

68.

Defendant Monsanto thus knew or should have known that Roundup® formulations are more toxic than glyphosate alone and that safety studies of Roundup® formulations and Roundup®'s adjuvants, "inert" ingredients, and/or surfactant(s) including POEA were necessary to protect Mr. Trosclair from Roundup® formulations.

69.

Monsanto failed to appropriately and adequately test Roundup® formulations, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Mr. Trosclair from glyphosate and/or Roundup® formulations.

70.

Rather than performing appropriate tests, Monsanto relied upon flawed industry-supported studies designed to protect Monsanto's economic interests rather than Mr. Trosclair and the consuming public.

71.

Despite its knowledge of the danger of glyphhosate and that Roundup® formulations were considerably more dangerous than glyphosate alone, Monsanto continued to promote Roundup® as safe. Monsanto has repeatedly proclaimed and continues to proclaim that glyphosate-based



---

[22] *See* Plaintiffs' Submission in Response to Pretrial Order No. 8, Ex. 7, *In re: Roundup Products Liability Litigation*, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 187-7.
[23] *See id.*

herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

### Recent Worldwide Bans on Roundup®/Glyphosate

72.

Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since the IARC first announced its assessment for glyphosate in March 2015. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are."[24]

73.

The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.[25]

74.

France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.[26]

75.

In 2017, Bermuda banned both the private and commercial sale of glyphosate, including Roundup®. The Bermuda government announced, "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."[27]

---

[24] *Holland's Parliament Bans Glyphosate Herbicides*, The Real Agenda, April 14, 2014, *available at* http://real-agenda.com/hollands-parliament-bans-glyphosate-herbicides/

[25] Christina Sarich, *Brazil's Public Prosecutor Wants to Ban Monsanto's Chemicals Following Recent Glyphosate-Cancer Link*, Global Research, May 14, 2015, *available at* http://www.globalresearch.ca/brazils-public-prosecutor-wants-to-ban-monsantos-chemicals-following-recent-glyphosate-cancer-link/5449440; *see* Ministério Público Federal, *MPF/DF reforça pedido para que glifosato seja banido do mercado nacional*, April, 14, 2015, *available at* http://noticias.pgr.mpf.mp.br/noticias/noticias-do-site/copy_of_meio-ambiente-e-patrimonio-cultural/mpf-df-reforca-pedido-para-que-glifosato-seja-banido-do-mercado-nacional.

[26] Zoe Schlanger, *France Bans Sales of Monsanto's Roundup in Garden Centers, 3 Months After U.N. Calls it 'Probable Carcinogen'*, Newsweek, June 15, 2015, *available at* http://www.newsweek.com/france-bans-sale-monsantos-roundup-garden-centers-after-un-names-it-probable-343311.

[27] *Health Minister: Importation of Roundup Weed Spray Suspended*, TODAY IN BERMUDA, May 11, 2015, *available at* http://www.todayinbermuda.com/news/health/item/1471-health-minister-importation-of-roundup-weed-spray-suspended.

76.

In 2019, Vietnam issued an immediate ban on the import and trans-national trading of herbicides containing glyphosate, including Roundup®. The Plant Protection Department further stated that glyphosate would soon be removed from the list of usable herbicides in Vietnam.[28]

77.

Various municipalities in the United States have adopted bans or restrictions on the use of glyphosate. For example, in 2019, the City of Miami prohibited the city and its contractors from the use of herbicides containing glyphosate.[29] Several towns in Barnstable County ("Cape Cod"), Massachusetts have banned glyphosate use on public property, including Orleans and Chatham.[30] Glyphosate is now banned from use in public spaces by the City of Chicago.[31] Also, Los Angeles County banned the use of glyphosate pending further analysis of its safety.[32]

### *Luling Plant*

78.

Luling Plant is located on the west bank of the Mississippi River approximately 15 miles from New Orleans, Louisiana, with its property encompassing approximately 1,550 acres.

79.

Luling Plant facility became a Monsanto property in 1955, when it merged with Lion Oil, the original owner of the facility. Lion Oil remained a division of Monsanto Chemical until 1972, when Monsanto took over after divesting itself of Lion Oil.[33]

80.

Luling Plant produced and/or produces both glyphosate and Roundup® formulations. As of 2008, a vice president for Monsanto, Jim Zimmer, explained that all Roundup® supplied to farmers in the United States came from Monsanto's two manufacturing facilities—Luling Plant

---

[28] Phan Anh, *Vietnam acts to ban cancer causing herbicides*, VN Express International, March 26, 2019, *available at* https://e.vnexpress.net/news/news/vietnam-acts-to-ban-cancer-causing-herbicides-3900162.html
[29] Jessica Lipscomb, *Miami Bans Controversial Herbicides That Are Killing Biscayne Bay*, Miami New Times, March 1, 2019, *available at* https://www.miaminewtimes.com/news/city-of-miami-bans-use-of-herbicides-containing-glyphosate-11100953.
[30] Alan Pollock, *The Last Roundup? Town to Stop Applying Herbicide Glyphosate on Town Properties*, The Cape Cod Chronicle, December 19, 2018, *available at* https://capecodchronicle.com/en/5351/chatham/3891/The-Last-Roundup-Town-To-Stop-Applying-Herbicide-Glyphosate-On-Town-Properties-Groundwater-protection-Health-Environment.htm.
[31] Ian Wylie, *Glyphosate is a 'probably carcinogenic' herbicide. Why do cities still use it?*, The Guardian, April 21, 2015, *available at* https://www.theguardian.com/cities/2015/apr/21/glyphosate-probably-carcinogenic-pesticide-why-cities-use-it.
[32] Andre Coleman, *Supervisors place moratorium on use of controversial herbicide*, Pasadena Weekly, March 21, 2019, *available at* https://www.pasadenaweekly.com/2019/03/21/supervisors-place-moratorium-on-use-of-controversial-herbicide/.
[33] *Luling Town History* | *St. Charles Parish, LA, available at* http://www.stcharlesparish-la.gov/departments/economic-development-and-tourism/parish-history/town-histories/luling-town-history/.

FAX MEMO

and Muscatine, Iowa.[34] "Those two plants run at 100 percent of capacity. So all of the Roundup we have available for U.S. farmers comes from those two facilities, and they are running as fast and furious as they can to produce all they can."[35]

81.

In 2008, Luling Plant began a $200 million enhancement project to expand its manufacturing capacity, which Monsanto claimed would increase the manufacturing capacity of Roundup® by 20% and the supply of glyphosate by more than 10%.[36]

82.

The expansion was completed and celebrated in 2010. Hugh Grant, Monsanto's CEO and Chairman, informed guests at the Luling facility that the expansion would allow Luling Plant to increase Roundup® production capacity by 20%.[37] The $200 million project also included improvements to rail lines, a new river dock and road improvements,[38] allowing better transport of glyphosate and/or Roundup® formulation.

83.

Luling Plant is the largest site among all producers responsible for glyphosate production.[39]

84.

Kerry Preete, president of Crop Protection Division, stated when speaking of Luling Plant and the surrounding area, "the region has provided us a wealth of scientific and manufacturing talent, and those employees contribute to the vitality of South Louisiana."[40]

***Plaintiff's Exposure to Roundup®***

85.

Mr. Trosclair sprayed glyphosate and/or Roundup® formulations beginning in 2012 at a farm owned by 3M Cattle, an agricultural business incorporated and operating in Luling, Louisiana. Mr. Trosclair sprayed glyphosate and/or Roundup® formulations at the farm until 2018 when he first learned glyphosate and/or Roundup® formulations was linked to NHL.

---

[34] *Monsanto explains reasons for its Roundup price hikes*, Delta FarmPress, April 4, 2008, *available at* https://www.farmprogress.com/monsanto-explains-reasons-its-roundup-price-hikes.
[35] *Id.*
[36] Monsanto News Release, April 2, 2008, *available at* https://monsanto.com/news-releases/monsanto-announces-planned-expansion-at-its-roundup-facility-in-luling-louisiana/.
[37] *Monsanto Announces Completion of Glyphosate Plant Expansion at Luling*, Agropages, March 5, 2010, *available at* http://news.agropages.com/News/NewsDetail---2239.htm.
[38] *Id.*
[39] *West Bank Hurricane Protection Project St. Charles Parish, Louisiana, available at* http://www.stcharlesparish-la.gov/Home/ShowDocument?id=4154.
[40] *Id.*

86.

Mr. Trosclair applied glyphosate and/or Roundup® formulation(s) between 2012 and 2018, using a backpack sprayer supplied by 3M Cattle.

87.

Prior to application, Mr. Trosclair prepared the herbicide by mixing glyphosate and/or Roundup® formulations with water for use in the sprayer. Mr. Trosclair sprayed approximately twenty (20) gallons of prepared Roundup® formulations six (6) to eight (8) times a year.

88.

Mr. Trosclair sprayed the mixed concentrate in fields, around farm equipment, along fence lines and right-of-ways, and in and around ditches. The backpack sprayer supplied by 3M Cattle leaked on numerous occasions. Thus, Mr. Trosclair's neck, shoulders, back, hand, wrist, and arm were exposed to glyphosate and/or Roundup® formulations leaking from the backpack, spray wand, and lid.

## CLAIM ONE – DESIGN DEFECT UNDER LSA-RS 9:2800.5

### Against Defendants Monsanto, Luling Plant, XL Bermuda, Catlin Insurance, and T.H.E. Insurance

89.

Plaintiff Trosclair incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

90.

Plaintiff Trosclair brings this products liability claim against Monsanto under the Louisiana Products Liability Act for defective design.

91.

At all times relevent to this litigation, Monsanto engaged in the business of manufacturing, formulating, creating, developing, designing, testing, producing, labeling, researching, marketing, promoting, advertising, selling, supplying, packaging, inspecting, and/or distributing glyphosate and/or Roundup® formulations, which are defective and unreasonably dangerous to consumers, including Mr. Trosclair, thereby placing glyphosate and/or Roundup® formulations into the stream of commerce, These actions were under the ultimate control and supervision of Monsanto. At all times relevant to this litigation, Monsanto manufactured, formulated, created, developed, designed, tested, produced, labeled, researched, marketed, promoted, advertised, sold, supplied, packaged, inspected, and/or distributedthe glyphosate and/or Roundup® formulation(s) used by

Mr. Trosclair as described above.

92.

At all times relevant to this litigation, Monsanto's glyphosate and/or Roundup® formulations were defectively designed by causing an increased risk of cancer and by containing additives that, when combined with glyphosate, significantly increase the risk of developing cancer.

93.

These design defects rendered glyphosate and/or Roundup® formulations unreasonably dangerous.

94.

The dangers posed by glyphosate and/or Roundup® formulations go beyond that which would be contemplated by the ordinary consumer with ordinary knowledge common to the community as to its characteristics.

95.

Additionally, the benefits of glyphosate and/or Roundup® formulations design(s) are outweighed by the design's inherent risk of danger in causing cancer.

96.

At all times relevant to this litigation, glyphosate and/or Roundup® formulations reached the intended consumers, handlers, and users or other persons coming into contact with these products in Louisiana, including Mr. Trosclair, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

97.

At all times relevant to this action, Monsanto knew or had reason to know that its glyphosate and/or Roundup® formulations were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Monsanto.

98.

Monsanto could have employed a safer alternative design to render glyphosate and/or Roundup® formulations safe or, in the alternative, provided proper instructions for use on how to limit the potential risk associated with glyphosate and/or the Roundup® formulations' defective design(s). Monsanto's glyphosate and/or Roundup® formulations were and are more dangerous than alternative products and Monsanto could have designed its glyphosate and/or Roundup®

formulations to make them less dangerous. At the time Monsanto designed its glyphosate and/or Roundup® formulations, the state of the industry's scientific knowledge was such that a less risky design(s) or formulation(s) was attainable. Thus, at the time glyphosate and/or Roundup® formulations left Monsanto's control, there was a practical, technically feasible and safer alternative design(s) that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Monsanto's herbicides.

99.

Mr. Trosclair was exposed to glyphosate and/or Monsanto's Roundup® formulations in the course of his work as described above, without knowledge of glyphosate and/or the Roundup® formulations' dangerous characteristics.

100.

At all times relevant to this litigation, Mr. Trosclair used and/or was exposed to the use of Monsanto's glyphosate and/or Roundup® formulations in an intended or reasonably foreseeable manner without knowledge of glyphosate and/or the Roundup® formulations' dangerous characteristics.

101.

Mr. Trosclair could not reasonably have discovered the defects and risks associated with Roundup® formulations or glyphosate-containing products before or at the time of exposure due to Monsanto's suppression of scientific information linking glyphosate to cancer.

102.

The defects in Monsanto's glyphosate and/or Roundup® formulations were substantial and contributing factors in causing Mr. Trosclair's injuries, and, but for Monsanto's misconduct and omissions, he would not have sustained said injuries.

103.

Monsanto's defective design of its glyphosate and/or Roundup® formulations was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of glyphosate and/or the Roundup® formulations, including Mr. Trosclair.

104.

Monsanto's conduct, as described above, was reckless. Monsanto risked the lives of consumers and users of its products, including Mr. Trosclair, with knowledge of the safety problems associated with Roundup® formulations and glyphosate-containing products, and

suppressed this knowledge from the general public. Monsanto made conscious decisions not to redesign, warn or inform the unsuspecting public.

105.

As a direct and proximate result of Monsanto's placing its defective glyphosate and/or Roundup® formulations into the stream of commerce, Mr. Trosclair was injured and has sustained pecuniary loss and general damages.

106.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor for compensatory damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## CLAIM TWO – INADEQUATE WARNING UNDER LSA – RS 9:2800.57

### Against Defendants Monsanto, XL Bermuda, Catlin Insurance, and T.H.E. Insurance

107.

Plaintiff Trosclair incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

108.

Plaintiff Trosclair brings this strict liability claim against Monsanto for failure to warn.

109.

At all times relevant to this litigation, Monsanto engaged in the business of manufacturing, formulating, creating, developing, designing, testing, producing, labeling, researching, marketing, promoting, advertising, selling, supplying, packaging, inspecting, and/or distributing glyphosate and/or Roundup® formulations, which are defective and unreasonably dangerous to consumers, including Mr. Trosclair, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® formulations and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Monsanto.

110.

Monsanto manufactured, formulated, created, developed, designed, tested, produced, labeled, researched, marketed, promoted, adverted, sold, supplied, packaged, inspected, distributed, and/or otherwise released into the stream of commerce its glyphosate and/or Roundup® formulations, and in the course of same, directly advertised or marketed the products to consumers and end users, including Mr. Trosclair, and therefore had a duty to warn of the risks associated

with the use of its Roundup® formulations and glyphosate-containing products.

111.

At all times relevant to this litigation, Monsanto had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure its glyphosate and/or Roundup® formulations did not cause users and consumers to suffer from unreasonable and dangerous risks. Monsanto had a continuing duty to warn Mr. Troslcair of the dangers associated with glyphosate and/or Roundup® formulation use and exposure. Monsanto, as manufacturer, seller, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

112.

At the time of manufacture, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup® formulations and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products. Such warnings could have been disclosed in circumstances not limited to the glyphosate and/or Roundup® formulation labeling.

113.

At all times relevant to this litigation, Monsanto failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by Monsanto's herbicides, including Mr. Trosclair.

114.

Despite the fact that Monsanto knew or should have known that glyphosate and/or Roundup® formulations posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Monsanto, or scientifically knowable to Monsanto through appropriate research and testing by known methods, at the time it distributed, supplied or sold the product, and not known to end users and consumers, such as Mr. Trosclair.

115.   **FAX MEMO**

Monsanto knew or should have known that its products created significant risks of serious bodily harm to consumers, as alleged herein, and Monsanto failed to adequately warn consumers, *i.e.*, the reasonably foreseeable users, of the risks of exposure to its products. Monsanto has

wrongfully concealed information concerning the dangerous nature of Roundup® formulations and the active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of glyphosate and Roundup® formulations.

116.

At all times relevant to this litigation, Monsanto's glyphosate and/or Roundup® formulations reached the intended consumers, handlers, and users or other persons coming into contact with these products in Louisiana, including Mr. Trosclair, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and/or marketed by Monsanto.

117.

Mr. Trosclair was exposed to Monsanto's glyphosate and/or Roundup® formulations in the course of his agricultural duties, as described above, without knowledge of their dangerous characteristics.

118.

At all times relevant to this litigation, Mr. Troslcair was exposed to glyphosate and/or Roundup® formulations while using them for their intended or reasonably foreseeable purposes, without knowledge of their dangerous characteristics.

119.

Mr. Trosclair could not have reasonably discovered the defects and risks associated with Roundup® formulations or glyphosate-containing products prior to or at the time of his exposure. Mr. Trosclair relied upon the skill, superior knowledge, and judgment of Monsanto to know about and disclose serious health risks associated with using the products.

120.

Monsanto knew or should have known that the minimal warnings disseminated with its glyphosate and/or Roundup® formulations were inadequate, failed to communicate adequate information on the dangers and safe use/exposure, and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

121.

This alleged failure to warn is not limited to the information contained on glyphosate and/or Roundup® formulations' labeling, or the lack thereof. Monsanto was able, in accord with federal

law, to comply with Louisiana law by disclosing the known risks associated with glyphosate and/or Roundup® formulations through other non-labeling mediums, *i.e.*, promotion, advertisements, public service announcements, and/or public information sources. Monsanto, however, did not disclose these known risks through any medium.

122.

To this day, Monsanto has failed to adequately and accurately warn of the risks of cancer associated with the use of and exposure to Roundup® formulations and the active ingredient glyphosate.

123.

As a result of their inadequate warnings, Monsanto's glyphosate and/or Roundup® formulations were defective and unreasonably dangerous when they left the possession and/or control of Monsanto, were distributed by Monsanto and/or its agents and/or employees, such as Mr. Jacobs and others similarly situated, and used by Mr. Trosclair as described herein.

124.

Monsanto is liable to Mr. Trosclair for injuries caused by its negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its products and the risks associated with the use of or exposure to glyphosate and/or Roundup® formulations .

125.

Had Monsanto provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its glyphosate and/or Roundup® formulations, Mr. Trosclair could have avoided the risk of developing injuries and could have obtained or used alternative herbicides.

126.

As a direct and proximate result of Monsanto's placing its defective glyphosate and/or Roundup® formulations into the stream of commerce, Mr. Trosclair sustained pecuniary loss and general damages.

127.        FAX MEMO

WHEREFORE, Plaintiff Trosclair respectfully requests that this Court enter judgment in his favor for compensatory damages, together with interest, costs herein incurred, attorneys' fees

and all such other and further relief as this Court deems just and proper.

## CLAIM THREE – INADEQUATE WARNING UNDER LSA-RS 9:2800.57

### Against Defendants Luling Plant, XL Bermuda, Catlin Insurance, and T.H.E. Insurance

128.

Plaintiff Trosclair incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

129.

Plaintiff Trosclair brings this strict liability claim against Luling Plant for failure to warn.

130.

Mr. Trosclair and/or 3M Cattle received glyphosate and/or Roundup® formulations directly from Luling Plant employee, Randy Jacobs, and/or others similarly situated. The glyphosate and/or Roundup® formulations were received in large containers which were not labeled as glyphosate and/or Roundup®. Instead, the containers had been repurposed to transfer glyphosate and/or Roundup® formulations to Mr. Trosclair and 3M Cattle for their agricultural use. These repurposed containers failed to provide any warning or precautions related to the use of glyphosate and/or Roundup® formulations and therefore did not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® formulations and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Luling Plant.

131.

At the time of manufacture, Luling Plant could and should have provided the warnings or instructions regarding the full and complete risks of Roundup® formulations and glyphosate-containing products to its employees and the public, in particular Mr. Trosclair, because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to its glyphosate and/or Roundup® formulations. Such warnings could and should have been disclosed in circumstances not limited to the glyphosate and/or Roundup® formulations labeling.

132.

Upon information and belief, Luling Plant employees provided glyphosate and/or Roundup® formulations to community members, like Mr. Trosclair, with no labeling, warnings, and/or instructions. Luling Plant could and should have known that Randy Jacobs and others similarly situated were removing and distributing glyphosate and/or Roundup® formulations from the facility to community members, like Mr. Trosclair, in an uncontrolled manner.

133.

Luling Plant could and should have controlled the unauthorized and/or improper removal and/or distribution of glyphosate and/or Roundup® formulations thereby preventing community members, like Mr. Trosclair, from receiving unlabeled substances lacking warnings and/or instructions.

134.

Glyphosate and Roundup® formulations are manufactured, formulated, created, developed, designed, tested, produced, researched, marketed, promoted, advertised, sold, supplied, packaged, inspected, labeled, distributed, and/or otherwise released into the stream of commerce at and from Luling Plant. In the course of same, Luling Plant distributed the products to members of the community, and end users, particularly Mr. Trosclair, who received glyphosate and/or Roundup® formulations directly from Luling Plant employee, Randy Jacobs. Therefore Luling Plant had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

135.

Luling Plant knew or should have known that the complete lack of warnings disseminated with its unlabeled glyphosate and/or Roundup® formulations were inadequate, failed to communicate adequate information on the dangers and safe use/exposure, and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

136.

As a result of its inadequate warnings, Luling Plant's unlabeled glyphosate and/or Roundup® formulations were defective and unreasonably dangerous when they left the possession and/or control of Luling Plant and Luling Plant's employee Randy Jacobs and were distributed to and used by members of the community including, but not limited to, Mr. Trosclair.

137.

Luling Plant is liable to Mr. Trosclair for injuries caused by its negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its products and the risks associated with the use of or exposure to glyphosate and/or Roundup® formulations, and for allowing and/or failing to prevent the distribution of unlabeled glyphosate and/or Roundup® formulations to Mr. Trosclair.

FAX MEMO

138.

Had Luling Plant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its glyphosate and/or Roundup® formulations, Mr. Trosclair could have avoided the risk of developing injuries and could have obtained or used alternative herbicides.

139.

As a direct and proximate result of Luling Plant's failure to adequately warn and prevent the distribution of glyphosate and/or Roundup® formulations, Mr. Trosclair sustained pecuniary loss and general damages.

140.

WHEREFORE, Plaintiff Trosclair respectfully requests that this Court enter judgment in his favor for compensatory damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## CLAIM FOUR – BREACH OF EXPRESS WARRANTY UNDER LSA-RS 9:2800.58

### Against Defendants Monsanto, XL Bermuda, Catlin Insurance, and T.H.E. Insurance

141.

Plaintiff Trosclair incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

142.

Monsanto expressly warranted that glyphosate and/or Roundup® formulations were safe and well accepted by consumers.

143.

Roundup® does not conform to these express representations, because glyphosate and/or Roundup® formulations are not safe and carry with them an increased risk of cancer by containing additives that, when combined with glyphosate, significantly increase the risk of developing cancer.

144.

At the time of the making of express warranties, Monsanto had knowledge of the purpose for which glyphosate and/or Roundup® formulations were to be used, and warranted same to be in

all respects safe, effective, and proper for such use.

145.

Monsanto expressly represented to Mr. Trosclair that glyphosate and/or Roundup® formulations were safe and fit for use for the purposes intended, that they were of merchantable quality, that they did not produce any dangerous side effects in excess of those risks associated with other herbicides, that the side effects they did produce were accurately reflected in the warnings, and that they were adequately tested and fit for their intended use.

146.

Monsanto knew or should have known that, in fact, its representations and warranties were false, misleading, and untrue in that glyphosate and/or Roundup® formulations were not safe and fit for the use intended, and, in fact, glyphosate and/or Roundup® formulations produced serious injuries to the users that were not accurately identified and represented by Monsanto.

147.

As a result of the foregoing acts and omissions, Defendants caused Mr. Trosclair to suffer serious and dangerous side effects, severe and personal injuries including economic and non-economic damages, harms, and losses, including, but not limited to: past medical expenses; past and future loss of earnings; mental anguish; severe and debilitating emotional distress; physical and mental pain, suffering, and discomfort; and loss and impairment of the quality and enjoyment of life.

## CLAIM FIVE – BREACH OF IMPLIED WARRANTY

### Against Defendants Monsanto, XL Bermuda, Catlin Insurance, and T.H.E. Insurance

148.

Plaintiff Trosclair incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

149.

Monsanto marketed, distributed, supplied and sold the glyphosate and/or Roundup® formulations as a "safe," general-purpose herbicide for widespread commercial and consumer use.

150.

At the time that Defendant marketed, distributed, supplied, and sold glyphosate and/or Roundup® formulations, they knew of the use for which the subject product was intended and impliedly warranted it to be of merchantable quality and safe and fit for such use.

151.

Mr. Trosclair reasonably relied upon the skill, superior knowledge, and judgment of Defendant Monsanto.

152.

Mr. Trosclair used the subject product for its intended purpose.

153.

Due to Defendant's wrongful conduct as alleged herein, Mr. Trosclair could not have known about the nature of the risks and side effects associated with glyphosate and/or Roundup® formulations until after its use.

154.

Contrary to the implied warranty for the subject product, the glyphosate and Roundup® formulations were not of merchantable quality, and were not safe or fit for their intended uses and purposes as alleged herein.

155.

As a direct and proximate result of Defendant's breach of implied warranty, Mr. Trosclair suffered severe and permanent physical injuries. Mr. Trosclair has endured substantial pain and suffering and has undergone extensive medical procedures. Mr. Trosclair has incurred significant expenses for medical care and treatment, and will continue to incur such expenses in the future. Mr. Trosclair has lost past earnings and have suffered a loss of earning capacity. Mr. Trosclair has suffered and will continue to suffer economic loss, and has otherwise been physically, emotionally and economically injured. Mr. Trosclair's injuries and damages are permanent and will continue into the future. Mr. Trosclair seeks actual damages from Defendant as alleged herein.

156.

WHEREFORE, Plaintiff demands judgment against Defendants for compensatory damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### CLAIM SIX - NEGLIGENCE

**Against Defendants Monsanto, XL Bermuda,**
**Catlin Insurance, and T.H.E. Insurance**

157.

Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

158.

Monsanto, directly or indirectly, caused glyphosate and/or Roundup® formulations to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Mr. Trosclair.

159.

At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the manufacture, formulation, creation, development, design, testing, production, labeling, research, marketing, promotion, advertisement, sell, supply, packaging, inspection, and/or distribution of its glyphosate and/or Roundup® formulations, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

160.

At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the marketing, advertisement, and sale of its glyphosate and/or Roundup® formulations. Monsanto's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using glyphosate and/or Roundup® formulations and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup® formulations and, in particular, the active ingredient glyphosate.

161.

At all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® formulations and specifically, the carcinogenic properties of the chemical glyphosate.

162.

Accordingly, at all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known that use of or exposure to its glyphosate and/or Roundup® formulations could cause or be associated with Mr. Trosclair's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Mr. Trosclair.

163.

Monsanto also knew or, in the exercise of reasonable care, should have known that users and consumers, including Mr. Trosclair, of glyphosate and/or Roundup® were unaware of the risks and the magnitude of the risks associated with the use of and/or exposure to Roundup® formulations and glyphosate-containing products.

164.

As such, Monsanto breached its duty of reasonable care and failed to exercise ordinary care in the manufacture, formulation, creation, development, design, testing, production, labeling, research, marketing, promotion, advertisement, sell, supply, packaging, inspection, and/or distribution of its glyphosate and/or Roundup® formulations, in that Monsanto manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

165.

Monsanto was negligent in its promotion of glyphosate and/or Roundup® formulations, outside of the labeling context, by failing to disclose material risk information as part of its promotion and marketing of glyphosate and/or Roundup® formulations, including the internet, television, print advertisements, etc. Nothing prevented Monsanto from being honest in its promotional activities, and in fact, Monsanto had a duty to disclose the truth about the risks associated with glyphosate and/or Roundup® formulations in its promotional efforts, outside of the of the context of labeling.

166.

Monsanto has the ability and means to investigate, study, and test its products and to provide adequate warnings, Monsanto has failed to do so. Indeed, Monsanto has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to glyphosate and Roundup® formulations.

167.

Monsanto's negligence included:

a) Manufacturing, formulating, creating, developing, designing, testing, producing, labeling, researching, marketing, promoting, advertising, selling, supplying, packaging, inspecting, and/or distributing its glyphosate and/or Roundup® formulations without thorough and adequate pre- and post-market testing;

b) Manufacturing, formulating, creating, developing, designing, testing, producing, labeling, researching, marketing, promoting, advertising, selling, supplying, packaging, inspecting, and/or distributing glyphosate and/or Roundup® formulations while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to glyphosate and/or Roundup® formulations;

c) Failing to undertake sufficient studies and conduct necessary tests to determine whether or not glyphosate and/or Roundup® formulations and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

d) Failing to use reasonable and prudent care in the design, research, manufacture, and development of glyphosate and/or Roundup® formulations so as to avoid the risk of serious harm associated with the prevalent use of Roundup® formulations/glyphosate as an herbicide;

e) Failing to design and manufacture Roundup® formulations so as to ensure they were at least as safe and effective as other herbicides on the market;

f) Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant could reasonably foresee would use and/or be exposed to its glyphosate and/or Roundup® formulations;

g) Failing to disclose to Mr. Trosclair, users, consumers, and the general public that the use of and exposure to glyphosate and/or Roundup® formulations presented severe risks of cancer and other grave illnesses;

h) Failing to warn Mr. Trosclair, users, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff and other users or consumers;

i) Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® formulations and glyphosate-containing products;

j) Representing that its glyphosate and/or Roundup® formulations were safe for their intended use when, in fact, Defendant knew or should have known that the products were not safe for their intended use;

k) Declining to make or propose any changes to glyphosate and/or Roundup® formulations' labeling or other promotional materials that would alert the consumers and the general public of the risks of glyphosate and Roundup® formulations;

l) Advertising, marketing, and recommending the use of glyphosate and/or Roundup® formulations, while concealing and failing to disclose or warn of the dangers known by Defendant to be associated with or caused by the use of or exposure to glyphosate and Roundup® formulations;

m) Continuing to disseminate information to its consumers, which indicate or imply that Defendant's Roundup® formulations are not unsafe for use in the agricultural and horticultural industries; and

n) Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

168.

Monsanto knew and/or should have known that it was foreseeable that consumers and/or users, such as Mr. Trosclair, would suffer injuries as a result of Monsanto's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of glyphosate and/or Roundup® formulations.

169.

Mr. Trosclair did not know the nature and extent of the injuries that could result from the

intended use of and/or exposure to glyphosate and/or Roundup® formulations.

170.

Monsanto's negligence was the proximate cause of the injuries, harm, and economic losses that Mr. Trosclair suffered, and will continue to suffer, as described herein.

171.

Monsanto's conduct, as described above, was negligent. Monsanto regularly risks the lives of consumers and users of its products, including Mr. Trosclair, with full knowledge of the dangers of its products. Monsanto has made conscious decisions not to redesign, re-label, warn, and/or inform the unsuspecting public, including Mr. Trosclair.

172.

WHEREFORE, Plaintiff respectfully request that this Court enter judgment in his favor for compensatory damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

### CLAIM SEVEN – NEGLIGENCE

**Against Defendants Luling Plant, XL Bermuda,
Catlin Insurance, and T.H.E. Insurance**

173.

Plaintiff Trosclair incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

174.

At all times relevant to this litigation, Luling Plant had a duty to exercise reasonable care in the manufacture, formulation, creation, development, design, testing, production, labeling, research, marketing, promotion, advertisement, sell, supply, packaging, inspection, and/or distribution of its glyphosate and/or Roundup formulations, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of its products.

175.

Luling Plant, directly or indirectly, caused glyphosate and/or Roundup® formulations to be distributed, and used by Mr. Trosclair. Furthermore, Luling Plant breached its duty of reasonable care and failed to exercise ordinary care in controlling the distribution of product via its employees and/or others similarly situated directly to persons and/or entities within the community.

FAX MEMO

176.

Luling Plant knew or should have known that its employees and/or others similarly situated were removing glyphosate and/or Roundup® formulations from the facility and distributing them to persons and/or entities within the community, including but not limited to 3M Cattle and/or Mr. Trosclair.

177.

At all times relevant to this litigation, Luling Plant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of glyphosate and/or Roundup® formulations and specifically, the carcinogenic properties of the chemical glyphosate.

178.

Accordingly, at all times relevant to this litigation, Luling Plant knew or, in the exercise of resonable care, should have known that use of or exposure to its glyphosate and/or Roundup® formulations could cause or be associated with Mr. Trosclair's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Mr. Trosclair.

179.

Luling Plant knew or, in the exercise of reasonable care, should have known that users and/or consumers of glyphosate and/or Roundup® formulations, including Mr. Trosclair, were unaware of the risks and the magnitude of the risks associated with the use of and/or exposure to Roundup® formulations and glyphosate-containing products.

180.

Luling Plant breached its duty of reasonable care and failed to exercise ordinary care in the manufacture, formulation, creation, development, design, testing, production, labeling, research, marketing, promotion, advertisement, sell, supply, packaging, inspection, and/or the distribution of its glyphosate and/or Roundup® formulations, in that Luling Plant manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

181.

Luling Plant's negligence included:

    a. Manufacturing, formulatiing creating, developing, designing, testing, producing, labeling, researching, marketing, promoting, advertising, selling, supplying,

packaging, inspecting, and/or distributing glyphosate and/or Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to glyphosate and/or Roundup® formulations;

b.  Failing to undertake sufficient studies and conduct necessary tests to determine whether Roundup® formulations and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

c.  Failing to use reasonable and prudent care in the design, research, manufacture, and development of glyphosate and/or Roundup® formulations so as to avoid the risk of serious harm associated with the prevalent use of glyphosate and/or Roundup® formulations as an herbicide;

d.  Failing to design and manufacture glyphosate and/or Roundup® formulations so as to ensure they were at least as safe and effective as other herbicides on the market;

e.  Failing to supervise, warn and/or train employees or others similarly situated as to the significant risk of harm related to the exposure and/or use of glyphosate and/or Roundup® formulations;

f.  Failing to supervise, warn against and/or prevent the uncontrolled distribution of glyphosate and/or Roundup® formulations from Luling Plant's facility;

g.  Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant could reasonably foresee would use and/or be exposed to its glyphosate and/or Roundup® formulations;

h.  Failing to disclose to Mr. Trosclair that the use of and exposure to glyphosate and/or Roundup® formulations presented severe risks of cancer and other grave illnesses;

i.  Failing to warn Mr. Trosclair that glyphosate and/or Roundup® formulations risk of harm was unreasonable and that there were safer and effective alternative herbicides available to him;

j.  Representing that its glyphosate and/or Roundup® formulations were safe for their intended use when, in fact, Defendant knew or should have known that the products were not safe for their intended use;

k.  Distributing glyphosate and/or Roundup® formulations in the absence of any labeling or other promotional materials that would alert Mr. Trosclair of the risks of glyphosate and/or Roundup® formulations;

l.  Advertising, marketing, and recommending the use of glyphosate and/or Roundup® formulations, while concealing and failing to disclose or warn of the dangers known by Defendant to be associated with or caused by the use of or exposure to glyphosate and/or Roundup® formulations; and

m.  Continuing to manufacture, distribute and transport glyphosate and/or Roundup® formulations with the knowledge that the products were unreasonably unsafe and dangerous;

182.

Luling Plant knew and/or should have known that it was foreseeable that consumers and/or users, such as Mr. Trosclair, would suffer injuries as a result of Luling Plant's failure to exercise ordinary care in the manufacturing, marketing, labeling, non-labeling, and/or distribution of glyphosate and/or Roundup® formulations.

183.

Mr. Trosclair did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to glyphosate and/or Roundup® formulations.

184.

Luling Plant's negligence was the proximate cause of the injuries, harm, and economic losses that Mr. Trosclair suffered, and will continue to suffer, as described herein.

185.

Luling Plant's conduct, as described above, was negligent. Luling Plant regularly risks the lives of consumers and users of its products, including Mr. Trosclair, with full knowledge of the dangers of its products. Luling Plant has failed to properly label its products, or to warn, or inform the unsuspecting public, including Mr. Trosclair.

186.

WHEREFORE, Plaintiff respectfully request that this Court enter judgment in his favor for compensatory damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## CLAIM EIGHT - NEGLIGENCE

### Against Defendant Randy Jacobs

187.

Plaintiff Trosclair incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

188.

Upon information and belief, Randy Jacobs is and/or was employed at Luling Plant, where glyphosate and/or Roundup® formulations are and/or were manufactured.

189.

Mr. Jacobs supplied 3M Cattle and/or Mr. Trosclair with glyphosate and/or Roundup® formulations from Luling Plant for agricultural use by Mr. Trosclair on multiple occasions.

190.

As an employee of Luling Plant, Mr. Jacobs had or should have had an elevated appreciation of the dangerous nature of chemicals in general, and glyphosate and/or Roundup®

formulations particularly. As such, Mr. Jacobs had a duty to act with reasonable care in the distribution of the products manufactured by his employer.

191.

Mr. Jacobs breached his duty of reasonable care, and failed to act with ordinary care, when he caused improperly labeled glyphosate and/or Roundup® formulations to be distributed to consumers directly, including but not limited to 3M Cattle and Mr. Trosclair.

192.

Mr. Jacobs knew and/or should have known that it was foreseeable that consumers and/or users, such as Mr. Trosclair, would suffer injuries as a result of Mr. Jacobs' failure to exercise ordinary care in the distribution of Luling Plant's glyphosate and/or Roundup® formulations.

193.

Mr. Trosclair did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to glyphosate and/or Roundup® formulations.

194.

Mr. Jacobs' negligence was the proximate cause of the injuries, harm, and economic losses that Mr. Trosclair suffered, and will continue to suffer, as described herein.

195.

Mr. Jacobs' distribution of dangerous and improperly labeled products to the unsuspecting public, including Mr. Trosclair, was negligent and therefore warrants an award of damages.

196.

WHEREFORE, Plaintiff respectfully request that this Court enter judgment in his favor for compensatory damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## CLAIM NINE - NEGLIGENCE

### Against Defendant 3M Cattle

197.

Plaintiff Trosclair incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

198.

At all times relevant to this litigation, 3M Cattle owned the agricultural property on which Mr. Trosclair used and was exposed to glyphosate and/or Roundup® formulations. 3M Cattle

FAX MEMO

acquired and/or purchased glyphosate and/or Roundup® formulations used by Mr. Trosclair on 3M Cattle's agricultural property, including product supplied by Mr. Jacobs and/or other Luling Plant employees and/or others similarly situated. 3M Cattle also provided defective equipment to Mr. Trosclair which he used to apply glyphosate and/or Roundup® formulations.

199.

3M Cattle had a duty to provide safe products for Mr. Trosclair to use on 3M Cattle property. Furthermore, 3M Cattle had a duty to ensure Mr. Trosclair was properly warned of any dangerous products 3M Cattle provided for his use, and that Mr. Trosclair was consistently provided safe and effective equipment including personal protection equipment.

200.

3M Cattle negligently breached its duty of reasonable care, and failed to act with ordinary care by providing Mr. Trosclair with improperly labeled and unreasonably dangerous glyphosate and/or Roundup® formulations for use in Mr. Trosclair's agricultural work on behalf of 3M Cattle. Furthermore, 3M Cattle failed to train Mr. Trosclair on how to safely handle dangerous herbicides, and failed to provide adequate equipment and/or failed to educate Mr. Trosclair regarding personal protective equipment.

201.

3M Cattle knew, or should have known, that the herbicide products provided by 3M Cattle to Mr. Trosclair were dangerous and could cause injuries to Mr. Trosclair.

202.

Mr. Trosclair did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to glyphosate and/or Roundup® formulations.

203.

3M Cattle's negligence was the proximate cause of the injuries, harm, and economic losses that Mr. Trosclair suffered, and will continue to suffer, as described herein.

204.

WHEREFORE, Plaintiff respectfully request that this Court enter judgment in his favor for compensatory damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

### CLAIM TEN - FRAUD

**Against Defendants Monsanto, XL Bermuda,
Catlin Insurance, and T.H.E. Insurance**

205.

Plaintiff Trosclair incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

206.

Monsanto has defrauded the public in general and Mr. Trosclair in particular by misrepresenting the true safety of glyphosate and/or Roundup® formulations and by failing to disclose known risks of cancer.

207.

Monsanto misrepresented and/or failed to disclose, inter alia, that: glyphosate and its major metabolite aminomethylphosphonic acid ("AMPA") could cause cancer; glyphosate and AMPA are known to be genotoxic in humans and laboratory animals because exposure is known to cause DNA strand breaks (a precursor to cancer); glyphosate and AMPA are known to induce oxidative stress in humans and laboratory animals (a precursor to cancer); glyphosate and AMPA interfere with the aromatic amino acids within the human gut, leading to downstream health conditions including cancer; exposure to glyphosate and AMPA is causally associated with non- Hodgkin's lymphoma; and the laboratory tests attesting to the safety of glyphosate were flawed and/or fraudulent.

208.

Due to these misrepresentations and omissions, at all times relevant to this litigation, Roundup® was misbranded and its distribution within Louisiana was contrary to law.

209.

When Mr. Trosclair used glyphosate and/or Roundup® formulations from 2012 through 2018, neither the label on the product nor Monsanto's general promotion warned or disclosed the true safety risks of glyphosate and/or Roundup® formulations or that the product(s) could cause cancer, as described above. Since the true risk information was known to Monsanto and was not reasonably knowable to consumers, Mr. Trosclair was unaware of these material facts and/or omissions prior to using the product.

210.

Mr. Trosclair relied on Monsanto's misrepresentations and/or material omissions regarding the safety of glyphosate and/or Roundup® formulations in deciding whether to use the product. Mr. Trosclair did not know nor could he reasonably have known of the misrepresentations and/or

material omissions by Monsanto concerning Roundup® formulations and the active ingredient glyphosate.

211.

The misrepresentations and/or material omissions that form the basis of this fraud claim are not limited to statements made on the Roundup® formulation labeling, as defined under federal law, but also involve Monsanto's representations and omissions made as part of its promotion and marketing of glyphosate and/or Roundup® formulations, including on the internet, television, in print advertisements, etc. Nothing prevented Monsanto from disclosing the truth about the risks associated with glyphosate and/or Roundup® formulations in its promotional efforts outside of the labeling context, using the forms of media and promotion Monsanto traditionally used to promote the product's efficacy and benefits.

212.

When Monsanto made the misrepresentations and/or omissions as alleged in this pleading, it did so with the intent of defrauding and deceiving the public in general, and Mr. Trosclair in particular, and with the intent of inducing the public to purchase and use glyphosate and/or Roundup® formulations.

213.

Monsanto made these misrepresentations and/or material omissions with malicious, fraudulent and/or oppressive intent toward Mr. Trosclair and the public generally. Monsanto's conduct was willful, wanton, and/or reckless. Monsanto deliberately manufactured, produced, marketed, sold, distributed, merchandized, packaged, promoted and advertised the dangerous and defective herbicide Roundup®. This constitutes an utter, wanton, and conscious disregard of the rights and safety of a large segment of the public including Mr. Trosclair, and by reason thereof, Monsanto, is liable for reckless, willful, and wanton acts and omissions which evidence a total and conscious disregard for the safety of Mr. Trosclair and others which proximately caused the injuries as set forth herein.

214.

As a proximate result of Monsanto's fraudulent and deceitful conduct and representations, Plaintiff sustained damages and other losses in an amount to be proven at trial.



216.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor for compensatory damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff prays for judgment against Defendants as follows:

1)   Judgment for Plaintiff and against Defendants;

2)   Damages in the form of compensatory damages in excess of the jurisdictional limits, trebled on all applicable counts;

3)   Physical pain and suffering of the Plaintiff;

4)   Pre and post judgment interest at the lawful rate;

5)   Reasonable attorneys' fees and costs and expert fees;

6)   A trial by jury on all issues of the case;

7)   For any other relief as this court may deem equitable and just;

8)   Costs of suit; and

(9)  Such other relief this Court deems just and proper.

Respectfully submitted,

MORRIS BART, LLC

By: _____
MORRIS BART III (#2788)
BETSY J. BARNES (#19473)
JOHN C. ENOCHS (#22774)
RICHARD L. ROOT (#19988)
601 Poydras Street, 24th Floor
New Orleans, LA 70130
Telephone: (504) 599-3308
Fascimile: (833) 277-4214

LUNDY, LUNDY, SOILEAU & SOUTH, LLP

By: _____
HUNTER W. LUNDY (#8938)
MATTHEW E. LUNDY (#18988)
RUDIE R. SOILEAU, JR. (#2119)
KRISTIE M. HIGHTOWER (#31782)
JACKEY W. SOUTH (#21125)
501 Broad Street (70601)
P. O. Box 3010
Lake Charles, LA 70602-3010
Telephone: (337) 439-0707
Facsimile: (337) 439-1029

*Attorneys for Plaintiff, Roland Trosclair, Jr.*

**PLEASE SERVE:**

MONSANTO COMPANY
*Through its registered agent*
Corporation Service Company
501 Louisiana Avenue
Baton Rouge, LA 70802;

MONSANTO MANUFACTURING FACILITY
*Through its registered agent*
Corporation Service Company
501 Louisiana Avenue
Baton Rouge, LA 70802;

XL BERMUDA, LTD.
Through the Louisiana Secretary of State
8585 Archives Avenue
Baton Rouge, LA 70809;

CATLIN INSURANCE SERVICES, INC.
*Through its registered agent*
CT Corporation System
3867 Plaza Tower Drive
Baton Rouge, LA 70816;

T.H.E. INSURANCE COMPANY
*Through its registered agent*
CT Corporation System
3867 Plaza Tower Drive
Baton Rouge, LA 70816;

3M CATTLE, L.L.C.
*Through its registered agent*
Courtney Mongrue
208 St. Charles Boulevard
Luling, LA 70070;

RANDY JACOBS
*At his domicile*
800 Sugarhouse Road
Luling, LA 70070.



## LUNDY, LUNDY, SOILEAU, & SOUTH, LLP
### A PROFESSIONAL LAW FIRM

March 28, 2019

**VIA FASCIMILE (985)783-6632**

H. Lance Marino, Clerk of Court
St. Charles Parish Clerk of Court
15045 River Road, P.O. Box 424
Hahnville, Louisiana 70057

Re:   Roland Joseph Trosclair, Jr.
         v.
         Monsanto Company; Monsanto Company Manufacturing Facility; XL Bermuda, LTD:
         Catlin Insurance Services, Inc.; T.H.E Insurance Company, LLC; and Randy Jacobs

Dear Mr. Marino:

Please find attached for filing Roland Joseph Trosclair, Jr.'s Petition for Damages. Please fax-file the same and provide a fax-confirmation sheet, along with any filing fees due. The originals will follow in the mail within five (5) business days along with the appropriate filing fee. Also, please return a file marked copy of the petition once you receive the originals.

If you have any questions or need anything further, please do not hesitate to contact either myself or my legal assistant, Chrystal Johnson.

Sincerely,

LUNDY, LUNDY, SOILEAU & SOUTH, LLP

Jackey W. South

JWS/caj

Enclosure

501 BROAD STREET/P. O. BOX 3010 ● LAKE CHARLES, LA 70601
TELEPHONE (337) 439-0707 ● FACSIMILE (337) 439-1029
www.lundylawllp.com

LANCE MARINO
CLERK OF COURT AND EX-OFFICIO RECORDER
PARISH OF ST. CHARLES
HAHNVILLE, LOUISIANA 70057
PHONE: (985) 783-6632
FAX: (985) 783-2005

## RECEIPT OF FACSIMILE TRANSMISSION
## NEW PETITION

FILED: MARCH 29, 2019

SUIT NUMBER: 86,054

DIVISION: D

ROLAND JOSEPH TROSCLAIR
VS
MONSANTO COMPANY ET AL

DEPUTY CLERK: CYNTHIA MOLLAIRE

TO: JACKEY SOUTH

For the facsimile to have the same force and effect as the original, the following must be forwarded to the Clerk of Court within seven days, exclusive of legal holidays, after the clerk of court has received the transmission.

    **(1) The original signed document. (cannot be a computer generated signature)**
    **(2) The applicable filing fee, if any.**
    **(3) A transmission fee of five dollars (included in the filing fee below)**

### *THE FOLLOWING MUST BE PROVIDED*
**(1) Include the suit number and title on your original Petition.**
**(2) Include a self - addressed envelope.**
**(3) All Petitions with service must include additional copies for service.**
    **(SEE NOTE BELOW)**
**(4) Attach a copy of this transmission receipt to your original pleading(s).**
**(5) Divorce Petition, cover sheet must be provided.**
**(6) Damage Petition, Civil Case Cover Sheet – LA. R.S. 13:4688.**

**(NOTE: YOU WILL BE CHARGED $2.00 PER PAGE FOR COPIES IF NO SERVICE COPIES ARE PROVIDED. COPIES ARE NEEDED FOR EACH SERVICE PLUS AN ADDITIONAL COPY FOR YOUR CONFORMED COPY. )**

FILING FEES ARE DUE UPON RECEIPT OF THIS TRANSMISSION.

FEES DUE:    $830.00     Payable to the Clerk of Court
             151.44     Payable to East Baton Rouge Civil Sheriff
             50.00     Payable to Louisiana Secretary of State

**NOTE: IT IS THE ATTORNEY'S RESPONSIBILITY TO NOTIFY THE JUDGES OFFICE OF ANY CONTINUANCES OR RESETS.**

## TRANSACTION REPORT

MAR/29/2019/FRI 01:12 PM

FAX(TX)

| # | DATE | START T. | RECEIVER | COM.TIME | PAGE | TYPE/NOTE | | FILE |
|---|------|----------|----------|----------|------|-----------|---|------|
| 001 | MAR/29 | 01:11PM | 13374391029 | 0:00:42 | 2 | MEMORY | OK | SG3 3321 |

## LANCE MARINO
CLERK OF COURT AND EX-OFFICIO RECORDER
PARISH OF ST. CHARLES
HAHNVILLE, LOUISIANA 70057
PHONE: (985) 783-6632
FAX: (985) 783-2005

### RECEIPT OF FACSIMILE TRANSMISSION
### NEW PETITION

FILED: MARCH 29, 2019

SUIT NUMBER: 86,054

DIVISION: D

ROLAND JOSEPH TROSCLAIR
VS
MONSANTO COMPANY ET AL

DEPUTY CLERK: CYNTHIA MOLLAIRE

TO: JACKEY SOUTH

For the facsimile to have the same force and effect as the original, the following must be
forwarded to the Clerk of Court within seven days, exclusive of legal holidays, after the clerk of
court has received the transmission.
    (1) **The original signed document. (cannot be a computer generated signature)**
    (2) **The applicable filing fee, if any.**
    (3) A transmission fee of five dollars (included in the filing fee below)

### *THE FOLLOWING MUST BE PROVIDED*
(1) Include the suit number and title on your original Petition.
(2) Include a self - addressed envelope.
(3) All Petitions with service must include additional copies for service.
    (SEE NOTE BELOW)
(4) Attach a copy of this transmission receipt to your original pleading(s).

## APPENDIX 9.6
## LOUISIANA CIVIL CASE REPORTING
### Civil Case Cover Sheet - LA. R.S. 13:4688, Part G, §13 of the Louisiana Supreme Court
### General Administrative Rules, and Appendix 9.6 of the Louisiana District Court Rules

This civil case cover sheet shall be completed by counsel for the petitioner, counsel's authorized representative, or by the self-represented litigant (if not represented by counsel) and submitted with the original petition filed with the court. The information should be the best available at the time of filing. This information does not constitute a discovery request, response or supplementation, and is not admissible at trial.

**Suit Caption:**

Roland Joseph Trosclair    **vs.**    Monsanto Company, et al

**Court:** _29th Judicial District Court_    **Docket Number:** _86, 054_

_April 2, 2019  ORIGINAL_

**Parish of Filing:** St. Charles    **Filing Date:** _March 29, 2019  FAXED_

**Name of Lead Petitioner's Attorney:** _Hunter W. Lundy_

**Name of Self-Represented Litigant:**_____

**Number of named petitioners:** _1_    **Number of named defendants:** _7_

**Type of Lawsuit:  Please check the categories which most appropriately apply to this suit (no more than 3 categories should be checked):**

| | |
|---|---|
| __Auto: Personal Injury | __ Auto: Property Damage |
| __Auto: Wrongful Death | __ Auto: Uninsured Motorist |
| __Asbestos: Property Damage | __ Asbestos: Personal Injury/Death |
| ✓Product Liability | __ Premise Liability |
| __Intentional Bodily Injury | __ Intentional Property Damage |
| __Intentional Wrongful Death | __ Unfair Business Practice |
| __Business Tort | __ Fraud |
| __Defamation | __ Professional Negligence |
| __Environmental Tort | __ Medical Malpractice |
| __ Intellectual Property | __ Toxic Tort |
| __ Legal Malpractice | __ Other Tort (describe below) |
| __ Other Professional Malpractice | __ Redhibition |
| __ Maritime | __ Class action (nature of case) |
| __ Wrongful Death | |
| __General Negligence | |

**Please briefly describe the nature of the litigation in one sentence of additional detail:**
Plaintiff suffered injuries caused by Defendant, Monsanto's Roundup products.

Following the completion of this form by counsel, counsel's representative, or by the self-represented litigant, this document will be submitted to the Office of the Judicial Administrator, Supreme Court of Louisiana, by the Clerk of Court.

Name, address and contact information of person completing form:

Name _Hunter W. Lundy_    Signature _____

Address _501 Broad Street/P. O. Box 3010, Lake Charles, LA  70601_

Phone number: _(337) 439-0707_    E-mail address: _hlundy@lundylawllp.com_

| | | |
|---|---|---|
| **ROLAND JOSEPH TROSCLAIR, JR.** | : | **29TH JUDICIAL DISTRICT COURT** |
| **v. NO.: 86, 054; DIV. "D"** | : | |
| **MONSANTO COMPANY; MONSANTO COMPANY MANUFACTURING FACILITY; XL BERMUDA, LTD.; CATLIN INSURANCE SERVICES, INC.; T.H.E. INSURANCE COMPANY; 3M CATTLE COMPANY, LLC; and RANDY JACOBS** | : : : : | **PARISH OF ST. CHARLES** **STATE OF LOUISIANA** |
| **FILED: March 29, 2019** | : | _____ |
| | | **DEPUTY CLERK OF COURT** |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## PETITION FOR DAMAGES

The Petitioner, ROLAND JOSEPH TROSCLAIR, JR., appears now before the Court, through undersigned counsel, and petitions the Court for recovery of the damages and for other relief and remedies prayed for in this Petition on the following grounds:

## PARTIES

1.

Plaintiff in this action is the following:

ROLAND TROSCLAIR, JR., a natural person of full age and majority who resides and is domiciled in St. Charles Parish, State of Louisiana.

Made Defendants herein are the following:

A. MONSANTO COMPANY ("MONSANTO"), a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri, registered and doing business in the State of Louisiana which may be served through its Agent for Service of Process, Corporation Service Company, 501 Louisiana Avenue, Baton Rouge, LA 70802;

B. MONSANTO COMPANY MANUFACTURING FACILITY, LULING, LOUISIANA ("LULING PLANT"), a manufacturing facility and principal business establishment doing business in the State of Louisiana located at Highway 18 River Road, Luling, LA 70070, which may be served through its Agent for Service of Process, Corporation Service Company, 501 Louisiana Avenue, Baton Rouge, LA 70802;

C. XL BERMUDA, LTD. ("XL BERMUDA"), a foreign corporation engaged in the insurance business, not registered but doing business in the State of Louisiana, which may be served through the Louisiana Secretary of State, 8585 Archives Avenue, Baton Rouge, LA 70809;

D. CATLIN INSURANCE SERVICES, INC. ("CATLIN INSURANCE"), a Louisiana corporation engaged in the insurance business, registered and doing business in the State of Louisiana, which may be served through its Agent for Service of Process at CT Corporation Syste at 3867 Plaza Tower Drive, Baton Rouge, LA 70816;

E. T.H.E. INSURANCE COMPANY ("T.H.E. INSURANCE"), a Louisiana company engaged in the insurance business, registered and doing business in the State of

Louisiana, which may be served through its Agent for Service of Process at CT Corporation System at 3867 Plaza Tower Drive, Baton Rouge, LA 70816;

F.  3M CATTLE, L.L.C. ("3M Cattle"), a Louisiana limited liability company engaged in agricultural business, registered and doing business in the State of Louisiana, which may be served through its Agent for Service of Process, Courtney Mongrue, 208 St. Charles Boulevard, Luling, LA 70070; and

G.  RANDY JACOBS, a natural person residing in the State of Louisiana and who may be served at his domicile at 800 Sugarhouse Road, Luling, LA 70070.

## JURISDICTION AND VENUE

2.

At all times relevant to this Petition, Monsanto was the entity that discovered the herbicidal properties of glyphosate and owns and operates a chemical plant in Luling, St. Charles Parish, Louisiana, which manufactured and/or manufactures both glyphosate, the active ingredient of Roundup® formulations, which contain the active ingredient glyphosate and surfactants and/or adjuvants such as Polyethoxlated tallow amine ("POEA"). On information and belief, important scientific, manufacturing, marketing, sales and other business decisions regarding glyphosate and/or Roundup® formulations were and are made from and in the State of Louisiana, and contributed to Monsanto's wrongdoing.

3.

At all times relevant hereto, Monsanto maintained offices in Louisiana and/or regularly solicited and transacted business in the State of Louisiana and in St. Charles Parish.  In addition, Monsanto reasonably expected that its products containing glyphosate would be used or consumed in Louisiana and St. Charles Parish and/or reasonably expected that its actions would lead to its company's products being used or consumed in Louisiana and St. Charles Parish.

4.

At all times relevant to this Petition, Monsanto was engaged in the business of manufacturing, formulating, creating, developing, designing, testing, producing, labeling, researching, marketing, promoting, advertising, selling, supplying, packaging, inspecting, and/or distributing glyphosate and/or Roundup® within the State of Louisiana.

5.

At all relevant times to this Petition, Monsanto had, and continues to have, regular and systematic contact with and conducts business in and from the State of Louisiana, such that it has purposefully availed itself of the laws of the State and expects to both sue and be sued in Louisiana.

In the alternative, Monsanto's presence in the State of Louisiana satisfies the due process requirements for Louisiana courts to exercise jurisdiction over it.

6.

The causes of action herein related to or arose from Monsanto's Louisiana-based conduct.

7.

At all times relevant hereto, Luling Plant maintained offices and manufacturing facilities in St. Charles Parish, and/or regularly solicited and transacted business in St. Charles Parish and the State of Louisiana.  In addition, Luling Plant reasonably expected that its products, glyphosate and/or Roundup® formulations, would be used in St. Charles Parish and Louisiana and/or reasonably expected that its actions would lead to its products being used or consumed in St. Charles Parish and Louisiana.

8.

At all times relevant to this Petition, Luling Plant was engaged in the business of manufacturing, formulating, creating, developing, designing, testing, producing, labeling, researching, marketing, promoting, advertising, selling, supplying, packaging, inspecting, and/or distributing glyphosate and/or Roundup® formulations within St. Charles Parish and the State of Louisiana.

9.

At all relevant times, Luling Plant had, and continues to have, regular and systematic contact with and conducts business in and from the State of Louisiana, such that it has purposefully availed itself of the laws of the State and expects to both sue and be sued in Louisiana. In the alternative, Luling Plant's presence in the State of Louisiana satisfies the due process requirements for Louisiana courts to exercise jurisdiction over it.

10.

The causes of action herein related to or arose from Luling Plant's Louisiana-based conduct.

11.

At all times relevant to this Petition, XL Bermuda provided excess liability insurance coverage to Monsanto under Policy Nos. XLRKS-02033, XLUMB-0233, and XLUMB-602764 for actions giving rise to the causes of action herein.

12.

At all times relevant to this Petition, Catlin Insurance is and/or was a subsidiary of XL Bermuda.

13.

At all times relevant to this Petition, T.H.E. Insurance is and/or was a subsidiary of XL Bermuda.

14.

It is the legislative intent of the State of Louisiana that polices of insurance are issued not only for the insured, but for the public at large.[1]

15.

At all times relevant to this Petition, 3M Cattle was a Louisiana limited liability company, operating an agricultural business in the State of Louisiana, Parish of St. Charles where Mr. Trosclair performed agricultural work on behalf of 3M Cattle.

16.

At all times relevant to this Petition, Randy Jacobs, upon information and belief, is and/or was an employee of and working at Luling Plant and domiciled in St. Charles Parish.

17.

Plaintiff has timely filed this lawsuit within one year of discovering his cause of action as defined and required by the Louisiana Civil Code.

18.

Venue in this Court is proper pursuant to La. C.C.P. Art. 42 inasmuch as: (1) Defendant 3M Cattle is a domestic limited liability company with its registered office in St. Charles Parish, Louisiana; (2) Defendant Randy Jacobs is domiciled in St. Charles Parish, Louisiana; and (3) Defendant Monsanto's Luling Plant's principal business establishment is domiciled in St. Charles Parish, Louisiana.

19.

XL Bermuda, Ltd., Catlin Insurance Services, Inc. and T.H.E. Insurance Company are engaged in the insurance business and are doing business in the State of Louisiana. Upon information and belief, XL Bermuda, Catlin Insurance Services, Inc. and T.H.E. Insurance Company provides/have provided insurance to Monsanto and Luling Plant which also includes

---

[1] LSA R.S. 22:1269, subpart D.

coverage for the actions of their employees and/or agents, and thus, are proper Defendants herein pursuant to Louisiana's Direct Action Statute La. R.S. 22: 1269.

20.

Pursuant to La. C.C.P. 2324 in actions alleging joint and several liability against two or more defendants, venue is proper if it is proper as to any of the defendants. In this case, Plaintiff alleges joint and several liability as to more than two defendants. The 29th Judicial District Court is the proper venue for one or more of these defendants. Therefore, venue is proper as to all defendants.

**PLAINTIFF'S INJURIES**

21.

Plaintiff Roland Trosclair, Jr. ("Mr. Trosclair") is a citizen of the State of Louisiana, and resides in St. Charles Parish, Louisiana. He was exposed to glyphosate and/or Roundup® formulations in St. Charles Parish, Louisiana. Mr. Trosclair was diagnosed with non-Hodgkin's lymphoma ("NHL") in June, 2015. Mr. Trosclair first learned that exposure to glyphosate and/or Roundup® formulations can cause NHL in 2018.

22.

Mr. Trosclair was first exposed to glyphosate and/or Roundup® formulations in 2012, when he began working on a farm owned by 3M Cattle in St. Charles Parish. Mr. Trosclair mixed concentrated Roundup® formulations which he regularly sprayed using a backpack sprayer until he became ill with NHL in 2015. Mr. Trosclair continued to be exposed to glyphosate and/or Roundup® formulations until 2018, when Mr. Trosclair learned glyphosate and/or Roundup® formulations were associated with NHL.

23.

On June 24, 2015, following MRI and CT scans, a biopsy diagnosed Mr. Trosclair with nodal marginal zone lymphoma Stage IV, a form of NHL. The diagnosis was confirmed with a bone marrow biopsy. A biopsy performed later that year following unsuccessful chemotherapy resulted in a diagnosis of small B-cell lymphoma. Since his diagnosis, Mr. Trosclair has suffered the effects attendant thereto, as a direct and proximate result of the unreasonable dangerous and defective nature of glyphosate and/or Roundup® formulations and Monsanto and Luling Plant's wrongful and negligent conduct in the manufacture, formulation, creation, development, design,

testing, production, labeling, research, marketing, promotion, advertise, sell, supplying, packaging, inspect, and/or distribution of glyphosate and/or Roundup® formulations.

24.

As a direct and proximate cause of these injuries, Mr. Trosclair has incurred and will continue to incur medical expenses in the future and has endured and will continue to endure pain and suffering and loss of enjoyment of life. Mr. Trosclair has otherwise been damaged in a personal and pecuniary nature.

25.

During the entire time Mr. Trosclair was exposed to glyphosate and/or Roundup® formulations®, he did not know that exposure to glyphosate and/or Roundup® formulations was injurious to his health or the health of others.

## BACKGROUND

26.

At all times relevant to this Petition, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup® formulation.

27.

At all times relevant to this Petition, Luling Plant has manufactured glyphosate and/or Roundup® formulations at the manufacturing facility in Luling, St. Charles Parish, Louisiana.

28.

Defendant Monsanto and Defendant Luling Plant have fraudulently manufactured, marketed, sold, and distributed a dangerous product to Louisiana citizens, including Mr. Trosclair.

29.

At all times relevant to this Petition, 3M Cattle has been a limited liability company in the State of Louisiana. 3M Cattle owns the farm where Mr. Trosclair sprayed glyphosate and/or Roundup® formulations from 2012 until 2018. 3M Cattle provided glyphosate and/or Roundup® formulation(s) and application equipment used by Mr. Trosclair to apply glyphosate and/or Roundup® formulation(s).

30.

Mr. Trosclair and/or 3M Cattle received glyphosate and/or Roundup® formulation(s) directly from Luling Plant. Containers filled with glyphosate and/or Roundup® formulation(s) were

provided to Mr. Trosclair and/or 3M Cattle by Mr. Randy Jacobs, an active Luling Plant employee, and/or others similarly situated.

## FACTS

31.

Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products. Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions, and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

32.

For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the World Health Organization ("WHO"), the main chemical ingredient of Roundup® — glyphosate—is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to glyphosate and/or Roundup® formulations such as employees in garden centers and nurseries and landscapers. Monsanto assured the public that glyphosate and/or Roundup® formulations were harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed the dangers of glyphosate and/or Roundup® formulations. Monsanto has led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that glyphosate and/or Roundup® formulations are safe.

### The Discovery of Glyphosate and Development of Roundup®

33.

In 1970, Defendant Monsanto discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. In addition to the active ingredient glyphosate, Roundup® formulations also contain adjuvants and other chemicals, such as the surfactant POEA, which are considered "inert" and therefore protected as "trade

secrets" in manufacturing.   In 2001, glyphosate was the most-used pesticide active ingredient in American agriculture with 85–90 million pounds used annually.  That number grew to 185 million pounds used in 2007.[2]  As of 2013, glyphosate was the world's most widely used herbicide.

34.

Upon information and belief, Monsanto's Roundup® products sold in the United States are manufactured domestically at Luling Plant and a manufacutring facility in Muscatine, Iowa.

### Registration of Herbicides under Federal Law

35.

The manufacture, formulation, and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 *et seq.*  FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act.  7 U.S.C. § 136a(a).[3]

36.

In the case of glyphosate, the EPA had planned on releasing its preliminary risk assessment—in relation to the re-registration process—no later than July 2015.  The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings. In December 2017, the EPA released a draft risk assessment for glyphosate, allowing a comment period through April 30, 2018.  The EPA is scheduled to publish the interim registration review decision for glyphosate in 2019.

### Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup®

37.

Based on early studies showing that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E) in 1991.  In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not

---

[2] Arthur Grube et al., U.S. Environmental Protection Agency, *Pesticides Industry Sales and Usage, 2006–2007 Market Estimates* 14 (2011), *available at*
http://www.epa.gov/pesticides/pestsales/07pestsales/market_estimates2007.pdf.
[3] Registration by the EPA is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."[4]

38.

On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® formulations for registration purposes committed fraud.

39.

In the first instance, Monsanto, in seeking initial registration of Roundup® by the EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®.[5]  IBT performed approximately 30 tests on glyphosate and glyphosate-containing products, including nine (9) of the 15 residue studies needed to register Roundup®.

40.

In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate.  The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid.[6]  An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."[7]  Three top executives of IBT were convicted of fraud in 1983.

41.

In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®.  In that same year, the owner

---

[4] U.S. Envtl. Prot. Agency, *Memorandum, Subject: SECOND Peer Review of Glyphosate* 1 (1991), *available at* http://www.epa.gov/pesticides/chem_search/cleared_reviews/csr_PC-103601_30-Oct-91_265.pdf.
[5] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories* (Sep. 2, 2015), *available at* http://www.monsanto.com/products/documents/glyphosate-background-materials/ibt_craven_bkg.pdf.
[6] U.S. Envtl. Prot. Agency, *Summary of the IBT Review Program Office of Pesticide Programs* (1983), *available at* http://nepis.epa.gov/Exe/ZyNET.exe/91014ULV.TXT?ZyActionD=ZyDocument&Client=EPA&Index=1981+Thru =1985&Docs=&Query=&Time=&EndTime=&SearchMethod=1&TocRestrict=n&Toc=&TocEntry=&QField=&QF ieldYear=&QFieldMonth=&QFieldDay=&IntQFieldOp=0&ExtQFieldOp=0&XmlQuery=&File=D%3A%5Czyfiles %5CIndex%20Data%5C81thru85%5CTxt%5C00000022%5C91014ULV.txt&User=ANONYMOUS&Password=an onymous&SortMethod=h%7C- &MaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/r75g8/x150y150g16/i425&Display=p%7Cf&De fSeekPage=x&SearchBack=ZyActionL&Back=ZyActionS&BackDesc=Results%20page&MaximumPages=1&ZyE ntry=1&SeekPage=x&ZyPURL.
[7] Marie-Monique Robin, *The World According to Monsanto: Pollution, Corruption and the Control of the World's Food Supply* (2011) (*citing* U.S. Envtl. Prot. Agency, *Data Validation, Memo from K. Locke, Toxicology Branch, to R. Taylor, Registration Branch. Washington, D.C.* (August 9, 1978)).

of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.[8]

### The Importance of Roundup® to Monsanto's Market Dominance and Profits

42.

The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. With its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

43.

In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate, farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

44.

Through a three-pronged strategy of increasing production, decreasing prices, and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue.[9] Today, glyphosate remains one of the world's largest herbicides by sales volume.

### Monsanto has known for decades that it falsely advertises the safety of Roundup®

45.

In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides,

---

[8] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories, supra.*
[9] David Barboza, *The Power of Roundup; A Weed Killer Is A Block for Monsanto to Build On,* N.Y. Times, Aug. 2, 2001, *available at* http://www.nytimes.com/2001/08/02/business/the-power-of-roundup-a-weed-killer-is-a-block-for-monsanto-to-build-on.html.

including Roundup®, were "**safer than table salt**" and "**practically non-toxic**" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of glyphosate and/or Roundup® are the following:

a) "Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ..."

b) "And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem."

c) "Roundup biodegrades into naturally occurring elements."

d) "Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

e) "This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it."

f) Glyphosate is less toxic to rats than table salt following acute oral ingestion.

g) "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

h) "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish."

i) "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[10]

46.

On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a) Its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

*   *   *

b) Its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable

*   *   *

c) Its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

*   *   *

---

[10] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

d) Its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

\* \* \*

e) Glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

\* \* \*

f) Its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

47.

In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."[11]

### *Classifications and Assessments of Glyphosate*

48.

On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the WHO, issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

49.

On July 29, 2015, the IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group ("WG") provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

50.

The IARC WG classified glyphosate as a Group 2A agent, which means that it is *probably carcinogenic to humans*. The IARC WG concluded the cancers most associated with glyphosate exposure are NHL and other hematopoietic cancers, including lymphocytic lymphoma, chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.[12]

51.

The IARC process for the classification of glyphosate followed the IARC's stringent procedures for the evaluation of a chemical agent. The established procedure for the IARC

---

[11] *Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15, 2009, *available at*
http://news.bbc.co.uk/2/hi/europe/8308903.stm.
[12] *See* Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate*, *supra*.

Monograph evaluations is described in the IARC Programme's Preamble.[13] Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

52.

One year before the Monograph Meeting, the Meeting is announced and there is a call for both data and experts. Eight months before the Meeting, the WG membership is selected and the sections of the Monograph are developed by the WG members. One month prior to the Meeting, the call for data is closed and the various draft sections are distributed among the WG members for review and comment. Finally, at the Meeting, the WG finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two (2) weeks after the Meeting, the summary of the WG findings is published in *The Lancet Oncology*, and within a year after the Meeting, the finalized Monograph is published.

53.

In assessing an agent, the IARC WG reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review.

54.

In March, 2015, the IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.[14]

55.

The assessment of the IARC WG identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

56.

The IARC WG also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

---

[13] World Health Org., *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Preamble*, (2006), *available at* http://monographs.iarc.fr/ENG/Preamble/CurrentPreamble.pdf.
[14] Categorization in Group 2A ("probably carcinogenic to humans") requires the IARC WG make "…at least *two of the following evaluations, including at least one* that involves either exposed humans or human cells or tissues: *limited evidence of carcinogenicity* in humans, *sufficient evidence of carcinogenicity* in experimental animals, [and/or] *strong evidence that the agent exhibits key characteristics of carcinogens*." *Id.* at page 42.

57.

In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor: renal tubule carcinoma. A second study reported a positive trend for hemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

58.

The IARC WG further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

59.

Because of its rigorous scientific method and independence, the IARC is a widely respected organization and its findings are considered authoritative. Organizations such as the American Cancer Society and Federal Judicial Center hold the IARC in high esteem  The Federal Judicial Center describes the IARC as "well-respected and prestigious" and notes that the IARC's assessment of carcinogenicity is "generally recognized as authoritative."[15] The U.S. Department of Labor's Occupational Safety and Health Administration also relies on the IARC assessments when requiring manufactures to warn of the potential carcinogenicity of chemicals.[16]

60.

Despite the IARC's impeccable reputation, on March 31, 2016, Monsanto's CEO falsely proclaimed to the public that glyphosate is not a carcinogen, disregarding the IARC's findings to the contrary.

61.

In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Monsanto's Roundup® formulations are more dangerous and toxic than glyphosate alone.[17] As early as 1991 evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.[18]

---

[15] Federal Judicial Ctr. "Reference Manual on Scientific Evidence." Washington, D.C. 20, 565 n. 46 (3d Ed. 2011).
[16] 29 C.F.R. § 1910.1200(d)(4) (2010). *California Chamber of Commerce v. Brown*, 196 Cal. App. 4th 233, 242, 126 Cal. Rptr. 3d 214, 219 (2011).
[17] Martinez, A., et al, *Cytotoxicity of the herbicide glyphosate in human peripheral blood mononuclear cells*, 27(4) BIOMEDICA 594-604 (2007); Nora Benachour, et al., *Glyphosate Formulations Induce Apoptosis and Necrosis in Human Umbilical, Embryonic and Placental Cells*, 22 CHEM. RES. TOXICOL. 97-105 (2008); Gasnier, C., et al, *Dig1 protects against cell death provoked by glyphosate-based herbicides in human liver cell lines*, 5:29 J OCCUP MED TOXICOL. (2010); Francisco Peixoto, *Comparative effects of the Roundup and Glyphosate on mitochondrial oxidative phosphorylation*, 61 CHEMOSPHERE 1115, 1122 (2005); Julie Marc, et al., *Glyphosate-based pesticides affect cell cycle regulation*, 96 BIOLOGY OF THE CELL 245, 245-249 (2004).
[18] T.T. Martinez and K. Brown, *Oral and pulmonary toxicology of the surfactant used in Roundup herbicide*, PROC. WEST. PHARMACOL. SOC. 34:43-46 (1991).

62.

A 2004 study finding a molecular link between glyphosate-based products and cell cycle dysregulation, noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell."[19] Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."[20]

63.

In 2005, a study by Francisco Peixoto, entitled "Comparative effects of the Roundup® and glyphosate on mitochondrial oxidative phosphorylation," demonstrated that Roundup®'s effects on rat liver mitochondria are far more toxic than equal concentrations of glyphosate alone. The Peixoto study suggested that the harmful effects of Roundup® on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup® formulation products.[21]

64.

The study used dilution levels of Roundup® and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed the adjuvants in Roundup® formulations are not "inert" and that Roundup® formulations are always more toxic than the active ingredient glyphosate.

65.

The results of these studies were confirmed in published peer-reviewed studies and were at all times available and/or known to Monsanto.

---

[19] Marc, et al. 2004.
[20] Molinari, M., *Cell cycle checkpoints and their inactivation in human cancer*, 33 CELL PROLIF. 261-274 (2010); Stewart, Z., et al, *Cell-cycle dysregulation and anticancer therapy*, 24 TRENDS PHARMACOLOGY SCIENCES 139-145 (2003).
[21] Peixoto 2005.

66.

Monsanto knew or should have known that Roundup® formulations are more toxic than glyphosate alone and that safety studies on Roundup formulations, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Mr. Trosclair from glyphosate and/or Roundup® formulations.

67.

Monsanto's chief toxicologist Donna Farmer has admitted that she cannot say that Roundup® does not cause cancer because Monsanto has not performed carcinogenicity studies with the formulated product Roundup®, the very product that caused Mr. Trosclair's NHL.[22] She further admitted that in the 35 years Monsanto has marketed Roundup® formulations to the public, Monsanto has conducted no chronic carcinogenicity studies on the formulated Roundup® product merely because EPA did not require such a study be performed for registration of glyphosate.[23]

68.

Defendant Monsanto thus knew or should have known that Roundup® formulations are more toxic than glyphosate alone and that safety studies of Roundup® formulations and Roundup®'s adjuvants, "inert" ingredients, and/or surfactant(s) including POEA were necessary to protect Mr. Trosclair from Roundup® formulations.

69.

Monsanto failed to appropriately and adequately test Roundup® formulations, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Mr. Trosclair from glyphosate and/or Roundup® formulations.

70.

Rather than performing appropriate tests, Monsanto relied upon flawed industry-supported studies designed to protect Monsanto's economic interests rather than Mr. Trosclair and the consuming public.

71.

Despite its knowledge of the danger of glyphhosate and that Roundup® formulations were considerably more dangerous than glyphosate alone, Monsanto continued to promote Roundup® as safe. Monsanto has repeatedly proclaimed and continues to proclaim that glyphosate-based

---

[22] See Plaintiffs' Submission in Response to Pretrial Order No. 8, Ex. 7, *In re: Roundup Products Liability Litigation*, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 187-7.
[23] See id.

herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

### Recent Worldwide Bans on Roundup®/Glyphosate

72.

Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since the IARC first announced its assessment for glyphosate in March 2015. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are."[24]

73.

The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.[25]

74.

France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.[26]

75.

In 2017, Bermuda banned both the private and commercial sale of glyphosate, including Roundup®. The Bermuda government announced, "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."[27]

---

[24] *Holland's Parliament Bans Glyphosate Herbicides*, The Real Agenda, April 14, 2014, *available at* http://real-agenda.com/hollands-parliament-bans-glyphosate-herbicides/.
[25] Christina Sarich, *Brazil's Public Prosecutor Wants to Ban Monsanto's Chemicals Following Recent Glyphosate-Cancer Link*, Global Research, May 14, 2015, *available at* http://www.globalresearch.ca/brazils-public-prosecutor-wants-to-ban-monsantos-chemicals-following-recent-glyphosate-cancer-link/5449440; *see* Ministério Público Federal, *MPF/DF reforça pedido para que glifosato seja banido do mercado naciona*, April, 14, 2015, *available at* http://noticias.pgr.mpf.mp.br/noticias/noticias-do-site/copy_of_meio-ambiente-e-patrimonio-cultural/mpf-df-reforca-pedido-para-que-glifosato-seja-banido-do-mercado-nacional.
[26] Zoe Schlanger, *France Bans Sales of Monsanto's Roundup in Garden Centers, 3 Months After U.N. Calls it 'Probable Carcinogen'*, Newsweek, June 15, 2015, *available at* http://www.newsweek.com/france-bans-sale-monsantos-roundup-garden-centers-after-un-names-it-probable-343311.
[27] *Health Minister: Importation of Roundup Weed Spray Suspended*, TODAY IN BERMUDA, May 11, 2015, *available at* http://www.todayinbermuda.com/news/health/item/1471-health-minister-importation-of-roundup-weed-spray-suspended.

76.

In 2019, Vietnam issued an immediate ban on the import and trans-national trading of herbicides containing glyphosate, including Roundup®. The Plant Protection Department further stated that glyphosate would soon be removed from the list of usable herbicides in Vietnam.[28]

77.

Various municipalities in the United States have adopted bans or restrictions on the use of glyphosate. For example, in 2019, the City of Miami prohibited the city and its contractors from the use of herbicides containing glyphosate.[29] Several towns in Barnstable County ("Cape Cod"), Massachusetts have banned glyphosate use on public property, including Orleans and Chatham.[30] Glyphosate is now banned from use in public spaces by the City of Chicago.[31] Also, Los Angeles County banned the use of glyphosate pending further analysis of its safety.[32]

### Luling Plant

78.

Luling Plant is located on the west bank of the Mississippi River approximately 15 miles from New Orleans, Louisiana, with its property encompassing approximately 1,550 acres.

79.

Luling Plant facility became a Monsanto property in 1955, when it merged with Lion Oil, the original owner of the facility. Lion Oil remained a division of Monsanto Chemical until 1972, when Monsanto took over after divesting itself of Lion Oil.[33]

80.

Luling Plant produced and/or produces both glyphosate and Roundup® formulations. As of 2008, a vice president for Monsanto, Jim Zimmer, explained that all Roundup® supplied to farmers in the United States came from Monsanto's two manufacturing facilities—Luling Plant

---

[28] Phan Anh, *Vietnam acts to ban cancer causing herbicides*, VN Express International, March 26, 2019, *available at* https://e.vnexpress.net/news/news/vietnam-acts-to-ban-cancer-causing-herbicides-3900162.html
[29] Jessica Lipscomb, *Miami Bans Controversial Herbicides That Are Killing Biscayne Bay*, Miami New Times, March 1, 2019, *available at* https://www.miaminewtimes.com/news/city-of-miami-bans-use-of-herbicides-containing-glyphosate-11100953.
[30] Alan Pollock, *The Last Roundup? Town to Stop Applying Herbicide Glyphosate on Town Properties*, The Cape Cod Chronicle, December 19, 2018, *available at* https://capecodchronicle.com/en/5351/chatham/3891/The-Last-Roundup-To-Stop-Applying-Herbicide-Glyphosate-On-Town-Properties-Groundwater-protection-Health-Environment.htm.
[31] Ian Wylie, *Glyphosate is a 'probably carcinogenic' herbicide. Why do cities still use it?*, The Guardian, April 21, 2015, *available at* https://www.theguardian.com/cities/2015/apr/21/glyphosate-probably-carcinogenic-pesticide-why-cities-use-it.
[32] Andre Coleman, *Supervisors place moratorium on use of controversial herbicide*, Pasadena Weekly, March 21, 2019, *available at* https://www.pasadenaweekly.com/2019/03/21/supervisors-place-moratorium-on-use-of-controversial-herbicide/.
[33] *Luling Town History | St. Charles Parish, LA*, *available at* http://www.stcharlesparish-la.gov/departments/economic-development-and-tourism/parish-history/town-histories/luling-town-history.

and Muscatine, Iowa.[34] "Those two plants run at 100 percent of capacity. So all of the Roundup we have available for U.S. farmers comes from those two facilities, and they are running as fast and furious as they can to produce all they can."[35]

81.

In 2008, Luling Plant began a $200 million enhancement project to expand its manufacturing capacity, which Monsanto claimed would increase the manufacturing capacity of Roundup® by 20% and the supply of glyphosate by more than 10%.[36]

82.

The expansion was completed and celebrated in 2010. Hugh Grant, Monsanto's CEO and Chairman, informed guests at the Luling facility that the expansion would allow Luling Plant to increase Roundup® production capacity by 20%.[37] The $200 million project also included improvements to rail lines, a new river dock and road improvements,[38] allowing better transport of glyphosate and/or Roundup® formulation.

83.

Luling Plant is the largest site among all producers responsible for glyphosate production.[39]

84.

Kerry Preete, president of Crop Protection Division, stated when speaking of Luling Plant and the surrounding area, "the region has provided us a wealth of scientific and manufacturing talent, and those employees contribute to the vitality of South Louisiana."[40]

***Plaintiff's Exposure to Roundup®***

85.

Mr. Trosclair sprayed glyphosate and/or Roundup® formulations beginning in 2012 at a farm owned by 3M Cattle, an agricultural business incorporated and operating in Luling, Louisiana. Mr. Trosclair sprayed glyphosate and/or Roundup® formulations at the farm until 2018 when he first learned glyphosate and/or Roundup® formulations was linked to NHL.

---

[34] *Monsanto explains reasons for its Roundup price hikes*, Delta FarmPress, April 4, 2008, *available at* https://www.farmprogress.com/monsanto-explains-reasons-its-roundup-price-hikes.
[35] *Id.*
[36] Monsanto News Release, April 2, 2008, *available at* https://monsanto.com/news-releases/monsanto-announces-planned-expansion-at-its-roundup-facility-in-luling-louisiana/.
[37] *Monsanto Announces Completion of Glyphosate Plant Expansion at Luling*, Agropages, March 5, 2010, *available at* http://news.agropages.com/News/NewsDetail---2239.htm.
[38] *Id.*
[39] *West Bank Hurricane Protection Project St. Charles Parish, Louisiana, available at* http://www.stcharlesparish-la.gov/Home/ShowDocument?id=4154.
[40] *Id.*

86.

Mr. Trosclair applied glyphosate and/or Roundup® formulation(s) between 2012 and 2018, using a backpack sprayer supplied by 3M Cattle.

87.

Prior to application, Mr. Trosclair prepared the herbicide by mixing glyphosate and/or Roundup® formulations with water for use in the sprayer. Mr. Trosclair sprayed approximately twenty (20) gallons of prepared Roundup® formulations six (6) to eight (8) times a year.

88.

Mr. Trosclair sprayed the mixed concentrate in fields, around farm equipment, along fence lines and right-of-ways, and in and around ditches. The backpack sprayer supplied by 3M Cattle leaked on numerous occasions. Thus, Mr. Trosclair's neck, shoulders, back, hand, wrist, and arm were exposed to glyphosate and/or Roundup® formulations leaking from the backpack, spray wand, and lid.

## CLAIM ONE – DESIGN DEFECT UNDER LSA-RS 9:2800.5

### Against Defendants Monsanto, Luling Plant, XL Bermuda, Catlin Insurance, and T.H.E. Insurance

89.

Plaintiff Trosclair incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

90.

Plaintiff Trosclair brings this products liability claim against Monsanto under the Louisiana Products Liability Act for defective design.

91.

At all times relevent to this litigation, Monsanto engaged in the business of manufacturing, formulating, creating, developing, designing, testing, producing, labeling, researching, marketing, promoting, advertising, selling, supplying, packaging, inspecting, and/or distributing glyphosate and/or Roundup® formulations, which are defective and unreasonably dangerous to consumers, including Mr. Trosclair, thereby placing glyphosate and/or Roundup® formulations into the stream of commerce, These actions were under the ultimate control and supervision of Monsanto. At all times relevant to this litigation, Monsanto manufactured, formulated, created, developed, designed, tested, produced, labeled, researched, marketed, promoted, advertised, sold, supplied, packaged, inspected, and/or distributedthe glyphosate and/or Roundup® formulation(s) used by

Mr. Trosclair as described above.

92.

At all times relevant to this litigation, Monsanto's glyphosate and/or Roundup® formulations were defectively designed by causing an increased risk of cancer and by containing additives that, when combined with glyphosate, significantly increase the risk of developing cancer.

93.

These design defects rendered glyphosate and/or Roundup® formulations unreasonably dangerous.

94.

The dangers posed by glyphosate and/or Roundup® formulations go beyond that which would be contemplated by the ordinary consumer with ordinary knowledge common to the community as to its characteristics.

95.

Additionally, the benefits of glyphosate and/or Roundup® formulations design(s) are outweighed by the design's inherent risk of danger in causing cancer.

96.

At all times relevant to this litigation, glyphosate and/or Roundup® formulations reached the intended consumers, handlers, and users or other persons coming into contact with these products in Louisiana, including Mr. Trosclair, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

97.

At all times relevant to this action, Monsanto knew or had reason to know that its glyphosate and/or Roundup® formulations were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Monsanto.

98.

Monsanto could have employed a safer alternative design to render glyphosate and/or Roundup® formulations safe or, in the alternative, provided proper instructions for use on how to limit the potential risk associated with glyphosate and/or the Roundup® formulations' defective design(s). Monsanto's glyphosate and/or Roundup® formulations were and are more dangerous than alternative products and Monsanto could have designed its glyphosate and/or Roundup®

formulations to make them less dangerous. At the time Monsanto designed its glyphosate and/or Roundup® formulations, the state of the industry's scientific knowledge was such that a less risky design(s) or formulation(s) was attainable. Thus, at the time glyphosate and/or Roundup® formulations left Monsanto's control, there was a practical, technically feasible and safer alternative design(s) that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Monsanto's herbicides.

99.

Mr. Trosclair was exposed to glyphosate and/or Monsanto's Roundup® formulations in the course of his work as described above, without knowledge of glyphosate and/or the Roundup® formulations' dangerous characteristics.

100.

At all times relevant to this litigation, Mr. Trosclair used and/or was exposed to the use of Monsanto's glyphosate and/or Roundup® formulations in an intended or reasonably foreseeable manner without knowledge of glyphosate and/or the Roundup® formulations' dangerous characteristics.

101.

Mr. Trosclair could not reasonably have discovered the defects and risks associated with Roundup® formulations or glyphosate-containing products before or at the time of exposure due to Monsanto's suppression of scientific information linking glyphosate to cancer.

102.

The defects in Monsanto's glyphosate and/or Roundup® formulations were substantial and contributing factors in causing Mr. Trosclair's injuries, and, but for Monsanto's misconduct and omissions, he would not have sustained said injuries.

103.

Monsanto's defective design of its glyphosate and/or Roundup® formulations was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of glyphosate and/or the Roundup® formulations, including Mr. Trosclair.

104.

Monsanto's conduct, as described above, was reckless. Monsanto risked the lives of consumers and users of its products, including Mr. Trosclair, with knowledge of the safety problems associated with Roundup® formulations and glyphosate-containing products, and

suppressed this knowledge from the general public. Monsanto made conscious decisions not to redesign, warn or inform the unsuspecting public.

105.

As a direct and proximate result of Monsanto's placing its defective glyphosate and/or Roundup® formulations into the stream of commerce, Mr. Trosclair was injured and has sustained pecuniary loss and general damages.

106.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor for compensatory damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

**CLAIM TWO – INADEQUATE WARNING UNDER LSA – RS 9:2800.57**

**Against Defendants Monsanto, XL Bermuda,
Catlin Insurance, and T.H.E. Insurance**

107.

Plaintiff Trosclair incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

108.

Plaintiff Trosclair brings this strict liability claim against Monsanto for failure to warn.

109.

At all times relevant to this litigation, Monsanto engaged in the business of manufacturing, formulating, creating, developing, designing, testing, producing, labeling, researching, marketing, promoting, advertising, selling, supplying, packaging, inspecting, and/or distributing glyphosate and/or Roundup® formulations, which are defective and unreasonably dangerous to consumers, including Mr. Trosclair, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® formulations and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Monsanto.

110.

Monsanto manufactured, formulated, created, developed, designed, tested, produced, labeled, researched, marketed, promoted, adverted, sold, supplied, packaged, inspected, distributed, and/or otherwise released into the stream of commerce its glyphosate and/or Roundup® formulations, and in the course of same, directly advertised or marketed the products to consumers and end users, including Mr. Trosclair, and therefore had a duty to warn of the risks associated

with the use of its Roundup® formulations and glyphosate-containing products.

111.

At all times relevant to this litigation, Monsanto had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure its glyphosate and/or Roundup® formulations did not cause users and consumers to suffer from unreasonable and dangerous risks. Monsanto had a continuing duty to warn Mr. Troslcair of the dangers associated with glyphosate and/or Roundup® formulation use and exposure. Monsanto, as manufacturer, seller, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

112.

At the time of manufacture, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup® formulations and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products. Such warnings could have been disclosed in circumstances not limited to the glyphosate and/or Roundup® formulation labeling.

113.

At all times relevant to this litigation, Monsanto failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by Monsanto's herbicides, including Mr. Trosclair.

114.

Despite the fact that Monsanto knew or should have known that glyphosate and/or Roundup® formulations posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Monsanto, or scientifically knowable to Monsanto through appropriate research and testing by known methods, at the time it distributed, supplied or sold the product, and not known to end users and consumers, such as Mr. Trosclair.

115.

Monsanto knew or should have known that its products created significant risks of serious bodily harm to consumers, as alleged herein, and Monsanto failed to adequately warn consumers, *i.e.*, the reasonably foreseeable users, of the risks of exposure to its products. Monsanto has

wrongfully concealed information concerning the dangerous nature of Roundup® formulations and the active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of glyphosate and Roundup® formulations.

116.

At all times relevant to this litigation, Monsanto's glyphosate and/or Roundup® formulations reached the intended consumers, handlers, and users or other persons coming into contact with these products in Louisiana, including Mr. Trosclair, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and/or marketed by Monsanto.

117.

Mr. Trosclair was exposed to Monsanto's glyphosate and/or Roundup® formulations in the course of his agricultural duties, as described above, without knowledge of their dangerous characteristics.

118.

At all times relevant to this litigation, Mr. Trosclair was exposed to glyphosate and/or Roundup® formulations while using them for their intended or reasonably foreseeable purposes, without knowledge of their dangerous characteristics.

119.

Mr. Trosclair could not have reasonably discovered the defects and risks associated with Roundup® formulations or glyphosate-containing products prior to or at the time of his exposure. Mr. Trosclair relied upon the skill, superior knowledge, and judgment of Monsanto to know about and disclose serious health risks associated with using the products.

120.

Monsanto knew or should have known that the minimal warnings disseminated with its glyphosate and/or Roundup® formulations were inadequate, failed to communicate adequate information on the dangers and safe use/exposure, and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

121.

This alleged failure to warn is not limited to the information contained on glyphosate and/or Roundup® formulations' labeling, or the lack thereof. Monsanto was able, in accord with federal

law, to comply with Louisiana law by disclosing the known risks associated with glyphosate and/or Roundup® formulations through other non-labeling mediums, *i.e.*, promotion, advertisements, public service announcements, and/or public information sources. Monsanto, however, did not disclose these known risks through any medium.

122.

To this day, Monsanto has failed to adequately and accurately warn of the risks of cancer associated with the use of and exposure to Roundup® formulations and the active ingredient glyphosate.

123.

As a result of their inadequate warnings, Monsanto's glyphosate and/or Roundup® formulations were defective and unreasonably dangerous when they left the possession and/or control of Monsanto, were distributed by Monsanto and/or its agents and/or employees, such as Mr. Jacobs and others similarly situated, and used by Mr. Trosclair as described herein.

124.

Monsanto is liable to Mr. Trosclair for injuries caused by its negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its products and the risks associated with the use of or exposure to glyphosate and/or Roundup® formulations .

125.

Had Monsanto provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its glyphosate and/or Roundup® formulations, Mr. Trosclair could have avoided the risk of developing injuries and could have obtained or used alternative herbicides.

126.

As a direct and proximate result of Monsanto's placing its defective glyphosate and/or Roundup® formulations into the stream of commerce, Mr. Trosclair sustained pecuniary loss and general damages.

127.

WHEREFORE, Plaintiff Trosclair respectfully requests that this Court enter judgment in his favor for compensatory damages, together with interest, costs herein incurred, attorneys' fees

and all such other and further relief as this Court deems just and proper.

### CLAIM THREE – INADEQUATE WARNING UNDER LSA-RS 9:2800.57

#### Against Defendants Luling Plant, XL Bermuda,
#### Catlin Insurance, and T.H.E. Insurance

128.

Plaintiff Trosclair incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

129.

Plaintiff Trosclair brings this strict liability claim against Luling Plant for failure to warn.

130.

Mr. Trosclair and/or 3M Cattle received glyphosate and/or Roundup® formulations directly from Luling Plant employee, Randy Jacobs, and/or others similarly situated. The glyphosate and/or Roundup® formulations were received in large containers which were not labeled as glyphosate and/or Roundup®. Instead, the containers had been repurposed to transfer glyphosate and/or Roundup® formulations to Mr. Trosclair and 3M Cattle for their agricultural use. These repurposed containers failed to provide any warning or precautions related to the use of glyphosate and/or Roundup® formulations and therefore did not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® formulations and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Luling Plant.

131.

At the time of manufacture, Luling Plant could and should have provided the warnings or instructions regarding the full and complete risks of Roundup® formulations and glyphosate-containing products to its employees and the public, in particular Mr. Trosclair, because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to its glyphosate and/or Roundup® formulations. Such warnings could and should have been disclosed in circumstances not limited to the glyphosate and/or Roundup® formulations labeling.

132.

Upon information and belief, Luling Plant employees provided glyphosate and/or Roundup® formulations to community members, like Mr. Trosclair, with no labeling, warnings, and/or instructions. Luling Plant could and should have known that Randy Jacobs and others similarly situated were removing and distributing glyphosate and/or Roundup® formulations from the facility to community members, like Mr. Trosclair, in an uncontrolled manner.

133.

Luling Plant could and should have controlled the unauthorized and/or improper removal and/or distribution of glyphosate and/or Roundup® formulations thereby preventing community members, like Mr. Trosclair, from receiving unlabeled substances lacking warnings and/or instructions.

134.

Glyphosate and Roundup® formulations are manufactured, formulated, created, developed, designed, tested, produced, researched, marketed, promoted, advertised, sold, supplied, packaged, inspected, labeled, distributed, and/or otherwise released into the stream of commerce at and from Luling Plant. In the course of same, Luling Plant distributed the products to members of the community, and end users, particularly Mr. Trosclair, who received glyphosate and/or Roundup® formulations directly from Luling Plant employee, Randy Jacobs. Therefore Luling Plant had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

135.

Luling Plant knew or should have known that the complete lack of warnings disseminated with its unlabeled glyphosate and/or Roundup® formulations were inadequate, failed to communicate adequate information on the dangers and safe use/exposure, and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

136.

As a result of its inadequate warnings, Luling Plant's unlabeled glyphosate and/or Roundup® formulations were defective and unreasonably dangerous when they left the possession and/or control of Luling Plant and Luling Plant's employee Randy Jacobs and were distributed to and used by members of the community including, but not limited to, Mr. Trosclair.

137.

Luling Plant is liable to Mr. Trosclair for injuries caused by its negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its products and the risks associated with the use of or exposure to glyphosate and/or Roundup® formulations, and for allowing and/or failing to prevent the distribution of unlabeled glyphosate and/or Roundup® formulations to Mr. Trosclair.

138.

Had Luling Plant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its glyphosate and/or Roundup® formulations, Mr. Trosclair could have avoided the risk of developing injuries and could have obtained or used alternative herbicides.

139.

As a direct and proximate result of Luling Plant's failure to adequately warn and prevent the distribution of glyphosate and/or Roundup® formulations, Mr. Trosclair sustained pecuniary loss and general damages.

140.

WHEREFORE, Plaintiff Trosclair respectfully requests that this Court enter judgment in his favor for compensatory damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

**CLAIM FOUR – BREACH OF EXPRESS WARRANTY UNDER LSA-RS 9:2800.58**

**Against Defendants Monsanto, XL Bermuda,**
**Catlin Insurance, and T.H.E. Insurance**

141.

Plaintiff Trosclair incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

142.

Monsanto expressly warranted that glyphosate and/or Roundup® formulations were safe and well accepted by consumers.

143.

Roundup® does not conform to these express representations, because glyphosate and/or Roundup® formulations are not safe and carry with them an increased risk of cancer by containing additives that, when combined with glyphosate, significantly increase the risk of developing cancer.

144.

At the time of the making of express warranties, Monsanto had knowledge of the purpose for which glyphosate and/or Roundup® formulations were to be used, and warranted same to be in

all respects safe, effective, and proper for such use.

145.

Monsanto expressly represented to Mr. Trosclair that glyphosate and/or Roundup® formulations were safe and fit for use for the purposes intended, that they were of merchantable quality, that they did not produce any dangerous side effects in excess of those risks associated with other herbicides, that the side effects they did produce were accurately reflected in the warnings, and that they were adequately tested and fit for theirintended use.

146.

Monsanto knew or should have known that, in fact, its representations and warranties were false, misleading, and untrue in that glyphosate and/or Roundup® formulations were not safe and fit for the use intended, and, in fact, glyphosate and/or Roundup® formulations produced serious injuries to the users that were not accurately identified and represented by Monsanto.

147.

As a result of the foregoing acts and omissions, Defendants caused Mr. Trosclair to suffer serious and dangerous side effects, severe and personal injuries including economic and non-economic damages, harms, and losses, including, but not limited to: past medical expenses; past and future loss of earnings; mental anguish; severe and debilitating emotional distress; physical and mental pain, suffering, and discomfort; and loss and impairment of the quality and enjoyment of life.

## CLAIM FIVE – BREACH OF IMPLIED WARRANTY

### Against Defendants Monsanto, XL Bermuda, Catlin Insurance, and T.H.E. Insurance

148.

Plaintiff Trosclair incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

149.

Monsanto marketed, distributed, supplied and sold the glyphosate and/or Roundup® formulations as a "safe," general-purpose herbicide for widespread commercial and consumer use.

150.

At the time that Defendant marketed, distributed, supplied, and sold glyphosate and/or Roundup® formulations, they knew of the use for which the subject product was intended and impliedly warranted it to be of merchantable quality and safe and fit for such use.

151.

Mr. Trosclair reasonably relied upon the skill, superior knowledge, and judgment of Defendant Monsanto.

152.

Mr. Trosclair used the subject product for its intended purpose.

153.

Due to Defendant's wrongful conduct as alleged herein, Mr. Trosclair could not have known about the nature of the risks and side effects associated with glyphosate and/or Roundup® formulations until after its use.

154.

Contrary to the implied warranty for the subject product, the glyphosate and Roundup® formulations were not of merchantable quality, and were not safe or fit for their intended uses and purposes as alleged herein.

155.

As a direct and proximate result of Defendant's breach of implied warranty, Mr. Trosclair suffered severe and permanent physical injuries. Mr. Trosclair has endured substantial pain and suffering and has undergone extensive medical procedures. Mr. Trosclair has incurred significant expenses for medical care and treatment, and will continue to incur such expenses in the future. Mr. Trosclair has lost past earnings and have suffered a loss of earning capacity. Mr. Trosclair has suffered and will continue to suffer economic loss, and has otherwise been physically, emotionally and economically injured. Mr. Trosclair's injuries and damages are permanent and will continue into the future. Mr. Trosclair seeks actual damages from Defendant as alleged herein.

156.

WHEREFORE, Plaintiff demands judgment against Defendants for compensatory damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## CLAIM SIX - NEGLIGENCE

### Against Defendants Monsanto, XL Bermuda, Catlin Insurance, and T.H.E. Insurance

157.

Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

158.

Monsanto, directly or indirectly, caused glyphosate and/or Roundup® formulations to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Mr. Trosclair.

159.

At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the manufacture, formulation, creation, development, design, testing, production, labeling, research, marketing, promotion, advertisement, sell, supply, packaging, inspection, and/or distribution of its glyphosate and/or Roundup® formulations, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

160.

At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the marketing, advertisement, and sale of its glyphosate and/or Roundup® formulations. Monsanto's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using glyphosate and/or Roundup® formulations and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup® formulations and, in particular, the active ingredient glyphosate.

161.

At all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® formulations and specifically, the carcinogenic properties of the chemical glyphosate.

162.

Accordingly, at all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known that use of or exposure to its glyphosate and/or Roundup® formulations could cause or be associated with Mr. Trosclair's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Mr. Trosclair.

163.

Monsanto also knew or, in the exercise of reasonable care, should have known that users and consumers, including Mr. Trosclair, of glyphosate and/or Roundup® were unaware of the risks and the magnitude of the risks associated with the use of and/or exposure to Roundup® formulations and glyphosate-containing products.

164.

As such, Monsanto breached its duty of reasonable care and failed to exercise ordinary care in the manufacture, formulation, creation, development, design, testing, production, labeling, research, marketing, promotion, advertisement, sell, supply, packaging, inspection, and/or distribution of its glyphosate and/or Roundup® formulations, in that Monsanto manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

165.

Monsanto was negligent in its promotion of glyphosate and/or Roundup® formulations, outside of the labeling context, by failing to disclose material risk information as part of its promotion and marketing of glyphosate and/or Roundup® formulations, including the internet, television, print advertisements, etc. Nothing prevented Monsanto from being honest in its promotional activities, and in fact, Monsanto had a duty to disclose the truth about the risks associated with glyphosate and/or Roundup® formulations in its promotional efforts, outside of the of the context of labeling.

166.

Monsanto has the ability and means to investigate, study, and test its products and to provide adequate warnings, Monsanto has failed to do so. Indeed, Monsanto has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to glyphosate and Roundup® formulations.

167.

Monsanto's negligence included:

a) Manufacturing, formulating, creating, developing, designing, testing, producing, labeling, researching, marketing, promoting, advertising, selling, supplying, packaging, inspecting, and/or distributing its glyphosate and/or Roundup® formulations without thorough and adequate pre- and post-market testing;

b) Manufacturing, formulating, creating, developing, designing, testing, producing, labeling, researching, marketing, promoting, advertising, selling, supplying, packaging, inspecting, and/or distributing glyphosate and/or Roundup® formulations while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to glyphosate and/or Roundup® formulations;

c) Failing to undertake sufficient studies and conduct necessary tests to determine whether or not glyphosate and/or Roundup® formulations and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

d) Failing to use reasonable and prudent care in the design, research, manufacture, and development of glyphosate and/or Roundup® formulations so as to avoid the risk of serious harm associated with the prevalent use of Roundup® formulations/glyphosate as an herbicide;

e) Failing to design and manufacture Roundup® formulations so as to ensure they were at least as safe and effective as other herbicides on the market;

f) Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant could reasonably foresee would use and/or be exposed to its glyphosate and/or Roundup® formulations;

g) Failing to disclose to Mr. Trosclair, users, consumers, and the general public that the use of and exposure to glyphosate and/or Roundup® formulations presented severe risks of cancer and other grave illnesses;

h) Failing to warn Mr. Trosclair, users, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff and other users or consumers;

i) Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® formulations and glyphosate-containing products;

j) Representing that its glyphosate and/or Roundup® formulations were safe for their intended use when, in fact, Defendant knew or should have known that the products were not safe for their intended use;

k) Declining to make or propose any changes to glyphosate and/or Roundup® formulations' labeling or other promotional materials that would alert the consumers and the general public of the risks of glyphosate and Roundup® formulations;

l) Advertising, marketing, and recommending the use of glyphosate and/or Roundup® formulations, while concealing and failing to disclose or warn of the dangers known by Defendant to be associated with or caused by the use of or exposure to glyphosate and Roundup® formulations;

m) Continuing to disseminate information to its consumers, which indicate or imply that Defendant's Roundup® formulations are not unsafe for use in the agricultural and horticultural industries; and

n) Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

168.

Monsanto knew and/or should have known that it was foreseeable that consumers and/or users, such as Mr. Trosclair, would suffer injuries as a result of Monsanto's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of glyphosate and/or Roundup® formulations.

169.

Mr. Trosclair did not know the nature and extent of the injuries that could result from the

intended use of and/or exposure to glyphosate and/or Roundup® formulations.

170.

Monsanto's negligence was the proximate cause of the injuries, harm, and economic losses that Mr. Trosclair suffered, and will continue to suffer, as described herein.

171.

Monsanto's conduct, as described above, was negligent. Monsanto regularly risks the lives of consumers and users of its products, including Mr. Trosclair, with full knowledge of the dangers of its products. Monsanto has made conscious decisions not to redesign, re-label, warn, and/or inform the unsuspecting public, including Mr. Trosclair.

172.

WHEREFORE, Plaintiff respectfully request that this Court enter judgment in his favor for compensatory damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## CLAIM SEVEN – NEGLIGENCE

### Against Defendants Luling Plant, XL Bermuda, Catlin Insurance, and T.H.E. Insurance

173.

Plaintiff Trosclair incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

174.

At all times relevant to this litigation, Luling Plant had a duty to exercise reasonable care in the manufacture, formulation, creation, development, design, testing, production, labeling, research, marketing, promotion, advertisement, sell, supply, packaging, inspection, and/or distribution of its glyphosate and/or Roundup formulations, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of its products.

175.

Luling Plant, directly or indirectly, caused glyphosate and/or Roundup® formulations to be distributed, and used by Mr. Trosclair. Furthermore, Luling Plant breached its duty of reasonable care and failed to exercise ordinary care in controlling the distribution of product via its employees and/or others similarly situated directly to persons and/or entities within the community.

176.

Luling Plant knew or should have known that its employees and/or others similarly situated were removing glyphosate and/or Roundup® formulations from the facility and distributing them to persons and/or entities within the community, including but not limited to 3M Cattle and/or Mr. Trosclair.

177.

At all times relevant to this litigation, Luling Plant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of glyphosate and/or Roundup® formulations and specifically, the carcinogenic properties of the chemical glyphosate.

178.

Accordingly, at all times relevant to this litigation, Luling Plant knew or, in the exercise of resonable care, should have known that use of or exposure to its glyphosate and/or Roundup® formulations could cause or be associated with Mr. Trosclair's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Mr. Trosclair.

179.

Luling Plant knew or, in the exercise of reasonable care, should have known that users and/or consumers of glyphosate and/or Roundup® formulations, including Mr. Trosclair, were unaware of the risks and the magnitude of the risks associated with the use of and/or exposure to Roundup® formulations and glyphosate-containing products.

180.

Luling Plant breached its duty of reasonable care and failed to exercise ordinary care in the manufacture, formulation, creation, development, design, testing, production, labeling, research, marketing, promotion, advertisement, sell, supply, packaging, inspection, and/or the distribution of its glyphosate and/or Roundup® formulations, in that Luling Plant manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

181.

Luling Plant's negligence included:

    a. Manufacturing, formulatiing creating, developing, designing, testing, producing, labeling, researching, marketing, promoting, advertising, selling, supplying,

packaging, inspecting, and/or distributing glyphosate and/or Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to glyphosate and/or Roundup® formulations;

b. Failing to undertake sufficient studies and conduct necessary tests to determine whether Roundup® formulations and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

c. Failing to use reasonable and prudent care in the design, research, manufacture, and development of glyphosate and/or Roundup® formulations so as to avoid the risk of serious harm associated with the prevalent use of glyphosate and/or Roundup® formulations as an herbicide;

d. Failing to design and manufacture glyphosate and/or Roundup® formulations so as to ensure they were at least as safe and effective as other herbicides on the market;

e. Failing to supervise, warn and/or train employees or others similarly situated as to the significant risk of harm related to the exposure and/or use of glyphosate and/or Roundup® formulations;

f. Failing to supervise, warn against and/or prevent the uncontrolled distribution of glyphosate and/or Roundup® formulations from Luling Plant's facility;

g. Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant could reasonably foresee would use and/or be exposed to its glyphosate and/or Roundup® formulations;

h. Failing to disclose to Mr. Trosclair that the use of and exposure to glyphosate and/or Roundup® formulations presented severe risks of cancer and other grave illnesses;

i. Failing to warn Mr. Trosclair that glyphosate and/or Roundup® formulations risk of harm was unreasonable and that there were safer and effective alternative herbicides available to him;

j. Representing that its glyphosate and/or Roundup® formulations were safe for their intended use when, in fact, Defendant knew or should have known that the products were not safe for their intended use;

k. Distributing glyphosate and/or Roundup® formulations in the absence of any labeling or other promotional materials that would alert Mr. Trosclair of the risks of glyphosate and/or Roundup® formulations;

l. Advertising, marketing, and recommending the use of glyphosate and/or Roundup® formulations, while concealing and failing to disclose or warn of the dangers known by Defendant to be associated with or caused by the use of or exposure to glyphosate and/or Roundup® formulations; and

m. Continuing to manufacture, distribute and transport glyphosate and/or Roundup® formulations with the knowledge that the products were unreasonably unsafe and dangerous;

182.

Luling Plant knew and/or should have known that it was foreseeable that consumers and/or users, such as Mr. Trosclair, would suffer injuries as a result of Luling Plant's failure to exercise ordinary care in the manufacturing, marketing, labeling, non-labeling, and/or distribution of glyphosate and/or Roundup® formulations.

183.

Mr. Trosclair did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to glyphosate and/or Roundup® formulations.

184.

Luling Plant's negligence was the proximate cause of the injuries, harm, and economic losses that Mr. Trosclair suffered, and will continue to suffer, as described herein.

185.

Luling Plant's conduct, as described above, was negligent. Luling Plant regularly risks the lives of consumers and users of its products, including Mr. Trosclair, with full knowledge of the dangers of its products. Luling Plant has failed to properly label its products, or to warn, or inform the unsuspecting public, including Mr. Trosclair.

186.

WHEREFORE, Plaintiff respectfully request that this Court enter judgment in his favor for compensatory damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## CLAIM EIGHT - NEGLIGENCE

### Against Defendant Randy Jacobs

187.

Plaintiff Trosclair incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

188.

Upon information and belief, Randy Jacobs is and/or was employed at Luling Plant, where glyphosate and/or Roundup® formulations are and/or were manufactured.

189.

Mr. Jacobs supplied 3M Cattle and/or Mr. Trosclair with glyphosate and/or Roundup® formulations from Luling Plant for agricultural use by Mr. Trosclair on multiple occasions.

190.

As an employee of Luling Plant, Mr. Jacobs had or should have had an elevated appreciation of the dangerous nature of chemicals in general, and glyphosate and/or Roundup®

formulations particularly. As such, Mr. Jacobs had a duty to act with reasonable care in the distribution of the products manufactured by his employer.

191.

Mr. Jacobs breached his duty of reasonable care, and failed to act with ordinary care, when he caused improperly labeled glyphosate and/or Roundup® formulations to be distributed to consumers directly, including but not limited to 3M Cattle and Mr. Trosclair.

192.

Mr. Jacobs knew and/or should have known that it was foreseeable that consumers and/or users, such as Mr. Trosclair, would suffer injuries as a result of Mr. Jacobs' failure to exercise ordinary care in the distribution of Luling Plant's glyphosate and/or Roundup® formulations.

193.

Mr. Trosclair did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to glyphosate and/or Roundup® formulations.

194.

Mr. Jacobs' negligence was the proximate cause of the injuries, harm, and economic losses that Mr. Trosclair suffered, and will continue to suffer, as described herein.

195.

Mr. Jacobs' distribution of dangerous and improperly labeled products to the unsuspecting public, including Mr. Trosclair, was negligent and therefore warrants an award of damages.

196.

WHEREFORE, Plaintiff respectfully request that this Court enter judgment in his favor for compensatory damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## CLAIM NINE - NEGLIGENCE

### Against Defendant 3M Cattle

197.

Plaintiff Trosclair incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

198.

At all times relevant to this litigation, 3M Cattle owned the agricultural property on which Mr. Trosclair used and was exposed to glyphosate and/or Roundup® formulations. 3M Cattle

acquired and/or purchased glyphosate and/or Roundup® formulations used by Mr. Trosclair on 3M Cattle's agricultural property, including product supplied by Mr. Jacobs and/or other Luling Plant employees and/or others similarly situated. 3M Cattle also provided defective equipment to Mr. Trosclair which he used to apply glyphosate and/or Roundup® formulations.

199.

3M Cattle had a duty to provide safe products for Mr. Trosclair to use on 3M Cattle property. Furthermore, 3M Cattle had a duty to ensure Mr. Trosclair was properly warned of any dangerous products 3M Cattle provided for his use, and that Mr. Trosclair was consistently provided safe and effective equipment including personal protection equipment.

200.

3M Cattle negligently breached its duty of reasonable care, and failed to act with ordinary care by providing Mr. Trosclair with improperly labeled and unreasonably dangerous glyphosate and/or Roundup® formulations for use in Mr. Trosclair's agricultural work on behalf of 3M Cattle. Furthermore, 3M Cattle failed to train Mr. Trosclair on how to safely handle dangerous herbicides, and failed to provide adequate equipment and/or failed to educate Mr. Trosclair regarding personal protective equipment.

201.

3M Cattle knew, or should have known, that the herbicide products provided by 3M Cattle to Mr. Trosclair were dangerous and could cause injuries to Mr. Trosclair.

202.

Mr. Trosclair did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to glyphosate and/or Roundup® formulations.

203.

3M Cattle's negligence was the proximate cause of the injuries, harm, and economic losses that Mr. Trosclair suffered, and will continue to suffer, as described herein.

204.

WHEREFORE, Plaintiff respectfully request that this Court enter judgment in his favor for compensatory damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

**CLAIM TEN - FRAUD**

**Against Defendants Monsanto, XL Bermuda,
Catlin Insurance, and T.H.E. Insurance**

205.

Plaintiff Trosclair incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

206.

Monsanto has defrauded the public in general and Mr. Trosclair in particular by misrepresenting the true safety of glyphosate and/or Roundup® formulations and by failing to disclose known risks of cancer.

207.

Monsanto misrepresented and/or failed to disclose, inter alia, that: glyphosate and its major metabolite aminomethylphosphonic acid ("AMPA") could cause cancer; glyphosate and AMPA are known to be genotoxic in humans and laboratory animals because exposure is known to cause DNA strand breaks (a precursor to cancer); glyphosate and AMPA are known to induce oxidative stress in humans and laboratory animals (a precursor to cancer); glyphosate and AMPA interfere with the aromatic amino acids within the human gut, leading to downstream health conditions including cancer; exposure to glyphosate and AMPA is causally associated with non-Hodgkin's lymphoma; and the laboratory tests attesting to the safety of glyphosate were flawed and/or fraudulent.

208.

Due to these misrepresentations and omissions, at all times relevant to this litigation, Roundup® was misbranded and its distribution within Louisiana was contrary to law.

209.

When Mr. Trosclair used glyphosate and/or Roundup® formulations from 2012 through 2018, neither the label on the product nor Monsanto's general promotion warned or disclosed the true safety risks of glyphosate and/or Roundup® formulations or that the product(s) could cause cancer, as described above. Since the true risk information was known to Monsanto and was not reasonably knowable to consumers, Mr. Trosclair was unaware of these material facts and/or omissions prior to using the product.

210.

Mr. Trosclair relied on Monsanto's misrepresentations and/or material omissions regarding the safety of glyphosate and/or Roundup® formulations in deciding whether to use the product. Mr. Trosclair did not know nor could he reasonably have known of the misrepresentations and/or

material omissions by Monsanto concerning Roundup® formulations and the active ingredient glyphosate.

211.

The misrepresentations and/or material omissions that form the basis of this fraud claim are not limited to statements made on the Roundup® formulation labeling, as defined under federal law, but also involve Monsanto's representations and omissions made as part of its promotion and marketing of glyphosate and/or Roundup® formulations, including on the internet, television, in print advertisements, etc. Nothing prevented Monsanto from disclosing the truth about the risks associated with glyphosate and/or Roundup® formulations in its promotional efforts outside of the labeling context, using the forms of media and promotion Monsanto traditionally used to promote the product's efficacy and benefits.

212.

When Monsanto made the misrepresentations and/or omissions as alleged in this pleading, it did so with the intent of defrauding and deceiving the public in general, and Mr. Trosclair in particular, and with the intent of inducing the public to purchase and use glyphosate and/or Roundup® formulations.

213.

Monsanto made these misrepresentations and/or material omissions with malicious, fraudulent and/or oppressive intent toward Mr. Trosclair and the public generally. Monsanto's conduct was willful, wanton, and/or reckless. Monsanto deliberately manufactured, produced, marketed, sold, distributed, merchandized, packaged, promoted and advertised the dangerous and defective herbicide Roundup®. This constitutes an utter, wanton, and conscious disregard of the rights and safety of a large segment of the public including Mr. Trosclair, and by reason thereof, Monsanto, is liable for reckless, willful, and wanton acts and omissions which evidence a total and conscious disregard for the safety of Mr. Trosclair and others which proximately caused the injuries as set forth herein.

214.

As a proximate result of Monsanto's fraudulent and deceitful conduct and representations, Plaintiff sustained damages and other losses in an amount to be proven at trial.

216.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor for compensatory damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff prays for judgment against Defendants as follows:

1)    Judgment for Plaintiff and against Defendants;

2)    Damages in the form of compensatory damages in excess of the jurisdictional limits, trebled on all applicable counts;

3)    Physical pain and suffering of the Plaintiff;

4)    Pre and post judgment interest at the lawful rate;

5)    Reasonable attorneys' fees and costs and expert fees;

6)    A trial by jury on all issues of the case;

7)    For any other relief as this court may deem equitable and just;

8)    Costs of suit; and

(9)    Such other relief this Court deems just and proper.

Respectfully submitted,

**MORRIS BART, LLC**

By: _____
MORRIS BART III (#2788)
BETSY J. BARNES (#19473)
JOHN C. ENOCHS (#22774)
RICHARD L. ROOT (#19988)
601 Poydras Street, 24th Floor
New Orleans, LA 70130
Telephone: (504) 599-3308
Fascimile: (833) 277-4214

LUNDY, LUNDY, SOILEAU & SOUTH, LLP

By: _____
    HUNTER W. LUNDY (#8938)
    MATTHEW E. LUNDY (#18988)
    RUDIE R. SOILEAU, JR. (#2119)
    KRISTIE M. HIGHTOWER (#31782)
    JACKEY W. SOUTH (#21125)
    501 Broad Street (70601)
    P. O. Box 3010
    Lake Charles, LA 70602-3010
    Telephone: (337) 439-0707
    Facsimile: (337) 439-1029

*Attorneys for Plaintiff, Roland Trosclair, Jr.*

**PLEASE SERVE:**

MONSANTO COMPANY
*Through its registered agent*
Corporation Service Company
501 Louisiana Avenue
Baton Rouge, LA 70802;

MONSANTO MANUFACTURING FACILITY
*Through its registered agent*
Corporation Service Company
501 Louisiana Avenue
Baton Rouge, LA 70802;

XL BERMUDA, LTD.
Through the Louisiana Secretary of State
8585 Archives Avenue
Baton Rouge, LA 70809;

CATLIN INSURANCE SERVICES, INC.
*Through its registered agent*
CT Corporation System
3867 Plaza Tower Drive
Baton Rouge, LA 70816;

T.H.E. INSURANCE COMPANY
*Through its registered agent*
CT Corporation System
3867 Plaza Tower Drive
Baton Rouge, LA 70816;

3M CATTLE, L.L.C.
*Through its registered agent*
Courtney Mongrue
208 St. Charles Boulevard
Luling, LA 70070;

RANDY JACOBS
*At his domicile*
800 Sugarhouse Road
Luling, LA 70070.

CERTIFICATE OF THE CLERK
I hereby certify that a copy of the foregoing motion
and or pleading has been mailed to all counsel of record

2nd day of April 20 19

By: Cynthia Naclene
    dly   Lance Marino   M. Lundy
          Clerk of Court
                          (7) services

## CITATION

TROSCLAIR, ROLAND JOSEPH JR

*Versus*

MONSANTO COMPANY - ET AL



Case: **00086054**
Division: D
29th *Judicial District Court*
*Parish of St. Charles*
*State of Louisiana*

TO:
  MONSANTO COMPANY
  THROUGH ITS REGISTERED AGENT
  CORPORATION SERVICE COMPANY
  501 LOUISIANA AVENUE
  BATON ROUGE, LA 70802

*You are hereby summoned to comply with the demand contained in the Faxed and Original Petition, of which a certified copy accompanies this citation, or file your answer to the same, in the office of the Clerk on the Twenty-ninth Judicial Court in and for the Parish of St. Charles, in the Court House of said Parish at Hahnville, La., within fifteen days after the service hereof. Your failure to comply herewith will subject you to the penalty of entry of default judgment against you.*

WITNESS THE HONORABLE JUDGES of the said Court on the 2nd day of April A.D., 20 19.

Lance Marino
CLERK OF COURT

BY: *Cynthia Mollaire*
     *Deputy Clerk of Court*

---

### Service Information

*Received on the _____ day of _____, 20_____ and on the _____ day of _____, 20_____ served the above named party as follows:*

**Personal Service** *on the party herein named _____.*
**Domiciliary Service** *on the party herein named by leaving the same at his/her domicile in the parish in the hands of _____, a person apparently over the age of sixteen years, living and residing in said domicile and whose name and other facts connected with this service, I learned by interrogating the said person, said party herein being absent from his/her residence at the time of said service.*

*Returned:*
*Parish of _____ this _____ day of _____, 20_____.*

*Service*    $_____

*Mileage*    $_____         By: _____
                                      *Deputy Sheriff*

*Total*       $_____

FOOTERAREA

# CITATION

TROSCLAIR, ROLAND JOSEPH JR

*Versus*

MONSANTO COMPANY - ET AL



Case: **00086054**
Division: D
29ᵗʰ *Judicial District Court*
*Parish of St. Charles*
*State of Louisiana*

TO:
   MONSANTO MANUFACTURING FACILITY
   THROUGH ITS REGISTERED AGENT
   CORPORATION SERVICE COMPANY
   501 LOUISIANA AVENUE
   BATON ROUGE, LA  70802

*You are hereby summoned to comply with the demand contained in the Faxed and Original Petition, of which a certified copy accompanies this citation, or file your answer to the same, in the office of the Clerk on the Twenty-ninth Judicial Court in and for the Parish of St. Charles, in the Court House of said Parish at Hahnville, La., within fifteen days after the service hereof. Your failure to comply herewith will subject you to the penalty of entry of default judgment against you.*

WITNESS THE HONORABLE JUDGES of the said Court on the 2nd day of April A.D., 2019.

            *Lance Marino*
            CLERK OF COURT

    BY: *Cynthia Mollaire*
            *Deputy Clerk of Court*

---

### *Service Information*

*Received on the _____ day of _____, 20_____ and on the _____ day of _____, 20_____ served the above named party as follows:*

**Personal Service** *on the party herein named _____.*
**Domiciliary Service** *on the party herein named by leaving the same at his/her domicile in the parish in the hands of _____, a person apparently over the age of sixteen years, living and residing in said domicile and whose name and other facts connected with this service, I learned by interrogating the said person, said party herein being absent from his/her residence at the time of said service.*

*Returned:*
*Parish of _____ this _____ day of _____, 20_____.*

*Service*   $_____

*Mileage*   $_____      *By:* _____
                         *Deputy Sheriff*

*Total*     $_____

FOOTERAREA

## CITATION

TROSCLAIR, ROLAND JOSEPH JR

*Versus*

MONSANTO COMPANY - ET AL



Case: **00086054**
Division: D
29th Judicial District Court
Parish of St. Charles
State of Louisiana

TO:
    XL BERMUDA, LTD.
    THROUGH THE LOUISIANA SECRETARY OF STATE
    8585 ARCHIVES AVENUE
    BATON ROUGE,  LA  70809

*You are hereby summoned to comply with the demand contained in the Faxed and Original Petition, of which a certified copy accompanies this citation, or file your answer to the same, in the office of the Clerk on the Twenty-ninth Judicial Court in and for the Parish of St. Charles, in the Court House of said Parish at Hahnville, La., within fifteen days after the service hereof. Your failure to comply herewith will subject you to the penalty of entry of default judgment against you.*

*WITNESS THE HONORABLE JUDGES of the said Court on the* 2nd *day of* April *A.D., 20* 19.

Lance Marino
CLERK OF COURT

BY: *Cynthia Mollaire*
    Deputy Clerk of Court

---

### *Service Information*

*Received on the _____ day of _____, 20_____ and on the _____ day of _____, 20_____ served the above named party as follows:*

**Personal Service** *on the party herein named _____.*
**Domiciliary Service** *on the party herein named by leaving the same at his/her domicile in the parish in the hands of _____, a person apparently over the age of sixteen years, living and residing in said domicile and whose name and other facts connected with this service, I learned by interrogating the said person, said party herein being absent from his/her residence at the time of said service.*

*Returned:*
*Parish of _____ this _____ day of _____, 20_____.*

*Service    $_____*

                        *By: _____*

*Mileage   $_____*                       *Deputy Sheriff*

*Total      $_____*

# CITATION

TROSCLAIR, ROLAND JOSEPH JR

Versus

MONSANTO COMPANY - ET AL



Case: **00086054**
Division: D
29th Judicial District Court
Parish of St. Charles
State of Louisiana

TO:
   CATLIN INSURANCE SERVICES, INC.
   THROUGH ITS REGISTERED AGENT
   CT CORPORATION SYSTEM
   3867 PLAZA TOWER DRIVE
   BATON ROUGE, LA 70816

You are hereby summoned to comply with the demand contained in the Faxed and Original Petition, of which a certified copy accompanies this citation, or file your answer to the same, in the office of the Clerk on the Twenty-ninth Judicial Court in and for the Parish of St. Charles, in the Court House of said Parish at Hahnville, La., within fifteen days after the service hereof. Your failure to comply herewith will subject you to the penalty of entry of default judgment against you.

WITNESS THE HONORABLE JUDGES of the said Court on the 2nd day of April A.D., 2019.

                                        Lance Marino
                                        CLERK OF COURT

                        BY: *Cynthia Mollaire*
                                        Deputy Clerk of Court

---

## Service Information

Received on the _____ day of _____, 20_____ and on the _____ day of _____, 20_____ served the above named party as follows:

**Personal Service** on the party herein named _____.
**Domiciliary Service** on the party herein named by leaving the same at his/her domicile in the parish in the hands of _____, a person apparently over the age of sixteen years, living and residing in said domicile and whose name and other facts connected with this service, I learned by interrogating the said person, said party herein being absent from his/her residence at the time of said service.

Returned:
Parish of _____ this _____ day of _____, 20_____.

Service     $_____
                              By: _____
Mileage    $_____              Deputy Sheriff

Total       $_____

FOOTERAREA

## CITATION

TROSCLAIR, ROLAND JOSEPH JR

*Versus*

MONSANTO COMPANY - ET AL



Case: **00086054**
Division: D
29th Judicial District Court
Parish of St. Charles
State of Louisiana

TO:

    *T.H.E. INSURANCE COMPANY*
    *THROUGH ITS REGISTERED AGENT*
    *CT CORPORATION SYSTEM*
    *3867 PLAZA TOWER DRIVE*
    *BATON ROUGE, LA  70816*

*You are hereby summoned to comply with the demand contained in the Faxed and Original Petition, of which a certified copy accompanies this citation, or file your answer to the same, in the office of the Clerk on the Twenty-ninth Judicial Court in and for the Parish of St. Charles, in the Court House of said Parish at Hahnville, La., within fifteen days after the service hereof. Your failure to comply herewith will subject you to the penalty of entry of default judgment against you.*

*WITNESS THE HONORABLE JUDGES of the said Court on the* 2nd *day of* April *A.D., 20* 19.

           *Lance Marino*
           *CLERK OF COURT*

    *BY:*  *Cynthia Mollaire*
           *Deputy Clerk of Court*

---

### Service Information

*Received on the _____ day of _____, 20_____ and on the _____ day of _____, 20_____ served the above named party as follows:*

**Personal Service** *on the party herein named _____.*
**Domiciliary Service** *on the party herein named by leaving the same at his/her domicile in the parish in the hands of _____, a person apparently over the age of sixteen years, living and residing in said domicile and whose name and other facts connected with this service, I learned by interrogating the said person, said party herein being absent from his/her residence at the time of said service.*

*Returned:*
*Parish of _____ this _____ day of _____, 20_____.*

*Service*    $_____
                      *By:* _____
*Mileage*    $_____
                              *Deputy Sheriff*

*Total*     $_____

FOOTERAREA

# CITATION

TROSCLAIR, ROLAND JOSEPH JR

*Versus*

MONSANTO COMPANY - ET AL



Case: **00086054**
Division: D
*29th Judicial District Court*
*Parish of St. Charles*
*State of Louisiana*

TO:
   3M CATTLE, L.L.C.
   THROUGH ITS REGISTERED AGENT
   COURTNEY MONGRUE
   208 ST. CHARLES BOULEVARD
   LULING, LA  70070

*You are hereby summoned to comply with the demand contained in the Faxed and Original Petition, of which a certified copy accompanies this citation, or file your answer to the same, in the office of the Clerk on the Twenty-ninth Judicial Court in and for the Parish of St. Charles, in the Court House of said Parish at Hahnville, La., within fifteen days after the service hereof. Your failure to comply herewith will subject you to the penalty of entry of default judgment against you.*

WITNESS THE HONORABLE JUDGES of the said Court on the 2nd day of April A.D., 2019.

                                        Lance Marino
                                        CLERK OF COURT

                              BY:  *Cynthia Mollaire*
                                        Deputy Clerk of Court

---

### *Service Information*

*Received on the _____ day of _____, 20_____ and on the _____ day of _____, 20_____ served the above named party as follows:*

**Personal Service** *on the party herein named _____.*
**Domiciliary Service** *on the party herein named by leaving the same at his/her domicile in the parish in the hands of _____, a person apparently over the age of sixteen years, living and residing in said domicile and whose name and other facts connected with this service, I learned by interrogating the said person, said party herein being absent from his/her residence at the time of said service.*

*Returned:*
*Parish of _____ this _____ day of _____, 20_____.*

*Service*      $_____
                              *By:* _____
*Mileage*     $_____                    *Deputy Sheriff*

*Total*          $_____

FOOTERAREA

## CITATION

---

*TROSCLAIR, ROLAND JOSEPH JR*

*Versus*

*MONSANTO COMPANY - ET AL*



*Case:* **00086054**
*Division: D*
*29ᵗʰ Judicial District Court*
*Parish of St. Charles*
*State of Louisiana*

---

*TO:*
  *RANDY  JACOBS*
  *800 SUGARHOUSE ROAD*
  *LULING,  LA  70070*


*You are hereby summoned to comply with the demand contained in the Faxed and Original Petition, of which a certified copy accompanies this citation, or file your answer to the same, in the office of the Clerk on the Twenty-ninth Judicial Court in and for the Parish of St. Charles, in the Court House of said Parish at Hahnville, La., within fifteen days after the service hereof. Your failure to comply herewith will subject you to the penalty of entry of default judgment against you.*

*WITNESS THE HONORABLE JUDGES of the said Court on the* 2nd *day of* April *A.D., 20*19*.*


                    *Lance Marino*
                    *CLERK OF COURT*

          *BY:*  *Cynthia Mollaire*
                    *Deputy Clerk of Court*

---

### Service Information

*Received on the _____ day of _____, 20_____ and on the _____ day of _____, 20_____ served the above named party as follows:*

**Personal Service** *on the party herein named _____.*
**Domiciliary Service** *on the party herein named by leaving the same at his/her domicile in the parish in the hands of _____, a person apparently over the age of sixteen years, living and residing in said domicile and whose name and other facts connected with this service, I learned by interrogating the said person, said party herein being absent from his/her residence at the time of said service.*


*Returned:*
*Parish of _____ this _____ day of _____, 20_____.*

*Service*     $_____

                    *By:* _____
*Mileage*     $_____                *Deputy Sheriff*

*Total*        $_____

FOOTERAREA

*CITATION* 

**RETURN**

TROSCLAIR, ROLAND JOSEPH JR

Versus

MONSANTO COMPANY - ET AL



*Case:* **00086054**
*Division: D*
*29th Judicial District Court*
*Parish of St. Charles*
*State of Louisiana*

TO:
  *3M CATTLE, L.L.C.*
  *THROUGH ITS REGISTERED AGENT*
  *COURTNEY MONGRUE*
  *208 ST. CHARLES BOULEVARD*
  *LULING, LA  70070*


*You are hereby summoned to comply with the demand contained in the Faxed and Original Petition, of which a certified copy accompanies this citation, or file your answer to the same, in the office of the Clerk on the Twenty-ninth Judicial Court in and for the Parish of St. Charles, in the Court House of said Parish at Hahnville, La., within fifteen days after the service hereof. Your failure to comply herewith will subject you to the penalty of entry of default judgment against you.*

*WITNESS THE HONORABLE JUDGES of the said Court on the 2nd day of April A.D., 2019.*


Lance Marino
CLERK OF COURT

BY: *Cynthia Mollaire*
     *Deputy Clerk of Court*


---

### Service Information

Received on the ___2___ day of ___April___, 20 _19_ and on the ___3___ day of ___Apr___, 20 _15_ served the above named party as follows:

**Personal Service** on the party herein named ___Courtney Mongrue___
**Domiciliary Service** on the party herein named by leaving the same at his/her domicile in the parish in the hands of _____, a person apparently over the age of sixteen years, living and residing in said domicile and whose name and other facts connected with this service, I learned by interrogating the said person, said party herein being absent from his/her residence at the time of said service.

Returned:
Parish of ___St Charles___ this ___3___ day of ___Apr___, 20 _19_.

Service     $ _____

Mileage     $ _____     By: _____
                                *Deputy Sheriff*

Total       $ _____

1040

FILED
APR 4 2019
CLERK OF COURT
ST CHARLES PARISH LA

[ RETURN COPY ]

*CITATION*

# RETURN

---

**TROSCLAIR, ROLAND JOSEPH JR**

*Versus*

**MONSANTO COMPANY - ET AL**



*Case:* **00086054**
*Division: D*
*29th Judicial District Court*
*Parish of St. Charles*
*State of Louisiana*

---

*TO:*
  *RANDY JACOBS*
  *800 SUGARHOUSE ROAD*
  *LULING, LA 70070*

*You are hereby summoned to comply with the demand contained in the Faxed and Original Petition, of which a certified copy accompanies this citation, or file your answer to the same, in the office of the Clerk on the Twenty-ninth Judicial Court in and for the Parish of St. Charles, in the Court House of said Parish at Hahnville, La., within fifteen days after the service hereof. Your failure to comply herewith will subject you to the penalty of entry of default judgment against you.*

*WITNESS THE HONORABLE JUDGES of the said Court on the 2nd day of April A.D., 2019.*

Lance Marino
CLERK OF COURT

BY: *Cynthia Mollaire*
Deputy Clerk of Court

---

### Service Information

Received on the **2** day of **Apr. l**, 20 **1** **9** and on the **3** day of **Aprl**, 20 **1** **9** served the above named party as follows:

**Personal Service** on the party herein named _____

**Domiciliary Service** on the party herein named by leaving the same at his/her domicile in the parish in the hands of **Sheila Jacob (Wife)**, a person apparently over the age of sixteen years, living and residing in said domicile and whose name and other facts connected with this service, I learned by interrogating the said person, said party herein being absent from his/her residence at the time of said service.

Returned:
Parish of **St Charles** this **3** day of **Apr. l**, 20 **19**.

Service       $ _____

Mileage       $ _____        By: _____
                                      Deputy Sheriff        **0802**
Total         $ _____

FILED
APR 9 - 2019
CLERK OF COURT
ST CHARLES PARISH LA

[ RETURN COPY ]

# CITATION

**TROSCLAIR, ROLAND JOSEPH JR**

*Versus*

**MONSANTO COMPANY - ET AL**



**Case: 00086054**
Division: D
29th Judicial District Court
Parish of St. Charles
State of Louisiana

TO:

T.H.E. INSURANCE COMPANY
THROUGH ITS REGISTERED AGENT
CT CORPORATION SYSTEM
3867 PLAZA TOWER DRIVE
BATON ROUGE, LA 70816

# RETURN

*You are hereby summoned to comply with the demand contained in the Faxed and Original Petition, of which a certified copy accompanies this citation, or file your answer to the same, in the office of the Clerk on the Twenty-ninth Judicial Court in and for the Parish of St. Charles, in the Court House of said Parish at Hahnville, La., within fifteen days after the service hereof. Your failure to comply herewith will subject you to the penalty of entry of default judgment against you.*

*WITNESS THE HONORABLE JUDGES of the said Court on the* 2nd *day of* April *A.D., 20* 19.

Lance Marino
CLERK OF COURT

BY: *Cynthia Mollaire*
*Deputy Clerk of Court*

I made service on the named party through the
CT Corporation

**APR 24 2019**
by tendering a copy of this document to
☐ Jeanniine Beauregard ☐ Brenna Beauregard
☐ _____ ☐ Marion Reed
*E. Cummins*
*Deputy Sheriff, Parish of East Baton Rouge, Loui*

**FILED**
APR 29 2019
CLERK OF COURT
ST CHARLES PARISH LA

## Service Information

Received on the _____ day of _____, 20____ and on the _____ day of _____, 20____ served the above named party as follows:

**Personal Service** on the party herein named _____
**Domiciliary Service** on the party herein named by leaving the same at his/her domicile in the parish in the hands of _____, a person apparently over the age of sixteen years, living and residing in said domicile and whose name and other facts connected with this service, I learned by interrogating the said person, said party herein being absent from his/her residence at the time of said service.

Returned:
Parish of _____ this _____ day of _____, 20____.

Service      $_____

Mileage    $_____           By: _____
                                              *Deputy Sheriff*

Total        $_____

[ RETURN COPY ]

## CITATION

**TROSCLAIR, ROLAND JOSEPH JR**

*Versus*

**MONSANTO COMPANY - ET AL**



Case: **00086054**
Division: **D**
29th Judicial District Court
Parish of St. Charles
State of Louisiana

TO:
CATLIN INSURANCE SERVICES, INC.
THROUGH ITS REGISTERED AGENT
CT CORPORATION SYSTEM
3867 PLAZA TOWER DRIVE
BATON ROUGE, LA 70816

# RETURN

*You are hereby summoned to comply with the demand contained in the Faxed and Original Petition, of which a certified copy accompanies this citation, or file your answer to the same, in the office of the Clerk on the Twenty-ninth Judicial Court in and for the Parish of St. Charles, in the Court House of said Parish at Hahnville, La., within fifteen days after the service hereof. Your failure to comply herewith will subject you to the penalty of entry of default judgment against you.*

*WITNESS THE HONORABLE JUDGES of the said Court on the **2nd** day of **April** A.D., 20 19.*

Lance Marino
CLERK OF COURT

BY: *Cynthia Mollaire*
Deputy Clerk of Court

*I made service on the named party through the
CT Corporation*
**APR 2 4 2019**
*by tendering a copy of this document to
☐ Jeannine Beauregard  ☑ Brenna Beauregard
☐ Alyson Reed*
*E. Cummins*
*Deputy Sheriff, Parish of East Baton Rouge, La.*

FILED
APR 29 2019
CLERK OF COURT
ST CHARLES PARISH LA

---

### Service Information

Received on the _____ day of _____, 20 _____ and on the _____ day of
_____, 20 _____ served the above named party as follows:

**Personal Service** on the party herein named _____.
**Domiciliary Service** on the party herein named by leaving the same at his/her domicile in the parish in the
hands of _____, a person apparently over the age of sixteen years,
living and residing in said domicile and whose name and other facts connected with this service, I learned by
interrogating the said person, said party herein being absent from his/her residence at the time of said service.

Returned:
Parish of _____ this _____ day of _____, 20 _____.

Service      $ _____

Mileage     $ _____               By: _____
                                             *Deputy Sheriff*

Total         $ _____

[ RETURN COPY ]

## CITATION



**TROSCLAIR, ROLAND JOSEPH JR**

*Versus*

**MONSANTO COMPANY - ET AL**

*Case:* **00086054**
*Division: D*
*29th Judicial District Court*
*Parish of St. Charles*
*State of Louisiana*

TO:
MONSANTO MANUFACTURING FACILITY
THROUGH ITS REGISTERED AGENT
CORPORATION SERVICE COMPANY
501 LOUISIANA AVENUE
BATON ROUGE, LA 70802

# RETURN

*You are hereby summoned to comply with the demand contained in the Faxed and Original Petition, of which a certified copy accompanies this citation, or file your answer to the same, in the office of the Clerk on the Twenty-ninth Judicial Court in and for the Parish of St. Charles, in the Court House of said Parish at Hahnville, La., within fifteen days after the service hereof. Your failure to comply herewith will subject you to the penalty of entry of default judgment against you.*

*WITNESS THE HONORABLE JUDGES of the said Court on the* **2nd** *day of* April *A.D., 20* 19.

Lance Marino
CLERK OF COURT
BY: Cynthia Mollaire
Deputy Clerk of Court

made service on the named party through the
CORPORATION SERVICE COMPANY
APR 24 2019
by tendering a copy of this document to:
☐ Paula Glaser
DY. E. CUMMINS #1155
Deputy Sheriff, Parish of East Baton Rouge, LA

FILED
APR 29 2019
CLERK OF COURT
ST CHARLES PARISH LA

### Service Information

Received on the _____ day of _____, 20____ and on the _____ day of _____, 20____ served the above named party as follows:

**Personal Service** on the party herein named _____
**Domiciliary Service** on the party herein named by leaving the same at his/her domicile in the parish in the hands of _____, a person apparently over the age of sixteen years, living and residing in said domicile and whose name and other facts connected with this service, I learned by interrogating the said person, said party herein being absent from his/her residence at the time of said service.

Returned:
Parish of _____ this _____ day of _____, 20___.

Service     $_____
Mileage     $_____
Total       $_____

By: _____
        *Deputy Sheriff*

[ RETURN COPY ]

*CITATION*

---

**TROSCLAIR, ROLAND JOSEPH JR**

*Versus*

**MONSANTO COMPANY - ET AL**



*Case: 00086054*
*Division: D*
*29th Judicial District Court*
*Parish of St. Charles*
*State of Louisiana*

---

TO:
 MONSANTO COMPANY
 THROUGH ITS REGISTERED AGENT
 CORPORATION SERVICE COMPANY
 501 LOUISIANA AVENUE
 BATON ROUGE, LA 70802

# RETURN

*You are hereby summoned to comply with the demand contained in the Faxed and Original Petition, of which a certified copy accompanies this citation, or file your answer to the same, in the office of the Clerk on the Twenty-ninth Judicial Court in and for the Parish of St. Charles, in the Court House of said Parish at Hahnville, La., within fifteen days after the service hereof. Your failure to comply herewith will subject you to the penalty of entry of default judgment against you.*

*WITNESS THE HONORABLE JUDGES of the said Court on the 2nd day of April A.D., 2019.*

Lance Marino
CLERK OF COURT

By *Cynthia Mollaire*
Deputy Clerk of Court

> I made service on the named party through the
> CORPORATION SERVICE COMPANY
> **APR 2 4 2019**
> by tendering a copy of this document to:
> ☐ Paula Glaser
> **DY. E. CUMMINS #1155**
> Deputy Sheriff, Parish of East Baton Rouge, LA

FILED
APR 2 9 2019
CLERK OF COURT
ST. CHARLES PARISH LA

---

*Service Information*

Received on the _____ day of _____, 20_____ and on the _____ day of _____, 20_____ served the above named party as follows:

**Personal Service** on the party herein named _____
**Domiciliary Service** on the party herein named by leaving the same at his/her domicile in the parish in the hands of _____, a person apparently over the age of sixteen years, living and residing in said domicile and whose name and other facts connected with this service, I learned by interrogating the said person, said party herein being absent from his/her residence at the time of said service.

*Returned:*
Parish of _____ this _____ day of _____, 20_____.

Service    $_____
Mileage    $_____          By: _____
                                      *Deputy Sheriff*
Total      $_____

[ RETURN COPY ]

*CITATION*



| | | |
|---|---|---|
| **TROSCLAIR, ROLAND JOSEPH JR** | | **Case: 00086054** |
| | | **Division: D** |
| *Versus* | | *29th Judicial District Court* |
| | | *Parish of St. Charles* |
| **MONSANTO COMPANY - ET AL** | | *State of Louisiana* |



TO:
   *XL BERMUDA, LTD.*
   *THROUGH THE LOUISIANA SECRETARY OF STATE*
   *8585 ARCHIVES AVENUE*
   *BATON ROUGE, LA 70809*

*You are hereby summoned to comply with the demand contained in the Faxed and Original Petition, of which a certified copy accompanies this citation, or file your answer to the same, in the office of the Clerk on the Twenty-ninth Judicial Court in and for the Parish of St. Charles, in the Court House of said Parish at Hahnville, La., within fifteen days after the service hereof. Your failure to comply herewith will subject you to the penalty of entry of default judgment against you.*

*WITNESS THE HONORABLE JUDGES of the said Court on the 2nd day of April A.D., 2019.*

          *Lance Marino*
          *CLERK OF COURT*

   *BY:* Cynthia Mollaire
          *Deputy Clerk of Court*



FILED
APR 29 2019
CLERK OF COURT
St. CHARLES PARISH LA

---

### *Service Information*

Received on the _____ day of _____, 20_____ and on the _____ day of _____, 20_____ served the above named party as follows:

**Personal Service** on the party herein named _____.
**Domiciliary Service** on the party herein named by leaving the same at his/her domicile in the parish in the hands of _____, a person apparently over the age of sixteen years, living and residing in said domicile and whose name and other facts connected with this service, I learned by interrogating the said person, said party herein being absent from his/her residence at the time of said service.

Returned:
Parish of _____ this _____ day of _____, 20_____.

Service   $_____

Mileage   $_____

Total     $_____

          *By:* _____
             *Deputy Sheriff*

I made service on the named party through the Office of the Secretary of State on
APR 2 4 2019
by tendering a copy of this document to
KATHY DARDEN
DY. E. CUMMINS #1155
Deputy Sheriff, Parish of East Baton Rouge, Louisiana

[ RETURN COPY ]

29TH JUDICIAL DISTRICT COURT FOR THE PARISH OF ST. CHARLES

STATE OF LOUISIANA

NO. 86,054                                       DIVISION "D"

ROLAND JOSEPH TROSCLAIR, JR.

VERSUS

MONSANTO COMPANY; MONSANTO COMPANY MANUFACTURING FACILITY; XL
BERMUDA, LTD.; CATLIN INSURANCE SERVICES, INC.; T.H.E. INSURANCE
COMPANY; 3M CATTLE COMPANY, LLC; and RANDY JACOBS

FILED: _____              _____
                                        DEPUTY CLERK

### MONSANTO COMPANY'S REQUEST FOR NOTICE

Defendant Monsanto Company ("Monsanto"), pursuant to Louisiana Code of
Civil Procedure Article 1572, moves this Court for written notice at least ten (10) days in
advance of the date fixed for a trial or hearing of any exception, motion, rule, or trial on the
merits in the above-captioned proceeding and, pursuant to Louisiana Code of Civil Procedure
Articles 1931 and 1941, requests immediate notice of all interlocutory and final orders and
judgments on any exceptions, motions, rules, or trial on the merits of the above-captioned
proceeding.

Respectfully submitted,

_____
Judy Y. Barrasso, (T.A.), 2814
Celeste R. Coco-Ewing, 25002
Shaun P. McFall, 37225
BARRASSO USDIN KUPPERMAN
    FREEMAN & SARVER, L.L.C.
909 Poydras Street, 24th Floor
New Orleans, Louisiana 70112
Telephone: 504-589-9700
Facsimile: 504-589-9701
jbarrasso@barrassousdin.com
ccoco-ewing@barrassousdin.com
smcfall@barrassousdin.com

*Attorneys for Monsanto Company*

1

1659933_1

FAX MEMO

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above and foregoing has been served upon all known counsel by electronic mail, facsimile and/or by United States Mail, postage prepaid and properly addressed, this 3rd day of May, 2019.



2

1659933_1

FAX MEMO

29TH JUDICIAL DISTRICT COURT FOR THE PARISH OF ST. CHARLES

STATE OF LOUISIANA

NO. 86,054                                              DIVISION "D"

ROLAND JOSEPH TROSCLAIR, JR.

VERSUS

MONSANTO COMPANY; MONSANTO COMPANY MANUFACTURING FACILITY; XL
BERMUDA, LTD., CATLIN INSURANCE SERVICES, INC.; T.H.E. INSURANCE
COMPANY; 3M CATTLE COMPANY, LLC; and RANDY JACOBS

FILED: _____

_____
DEPUTY CLERK

**MONSANTO COMPANY'S
UNOPPOSED _EX PARTE_ MOTION FOR EXTENSION OF TIME**

Defendant Monsanto Company ("Monsanto") moves for an extension of time
within which to respond to the Petition for Damages in this matter, up to and including June 10,
2019, on the following grounds:

1.

Monsanto would like to respond adequately but needs additional time to respond.

2.

The requested extension will not unduly delay the hearing or determination of this
case.

3.

Plaintiff has consented to this extension.

WHEREFORE Monsanto respectfully requests an extension of time within which
to respond to the Petition for Damages, up to and including June 10, 2019.

1

1659914_1



Respectfully submitted,

Judy Y. Barrasso, (T.A.), 2814
Celeste R. Coco-Ewing, 25002
Shaun P. McFall, 37225
BARRASSO USDIN KUPPERMAN
   FREEMAN & SARVER, L.L.C.
909 Poydras Street, 24th Floor
New Orleans, Louisiana 70112
Telephone: 504-589-9700
Facsimile: 504-589-9701
jbarrasso@barrassousdin.com
ccoco-ewing@barrassousdin.com
smcfall@barrassousdin.com

*Attorneys for Monsanto Company*

2

1659914.1

FAX MEMO

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing has been served upon all known counsel by electronic mail, facsimile and/or by United States Mail, postage prepaid and properly addressed, this 3rd day of May, 2019.

3

1059914 1



29TH JUDICIAL DISTRICT COURT FOR THE PARISH OF ST. CHARLES

STATE OF LOUISIANA

NO. 86,054                                        DIVISION "D"

ROLAND JOSEPH TROSCLAIR, JR.

VERSUS

MONSANTO COMPANY; MONSANTO COMPANY MANUFACTURING FACILITY; XL
BERMUDA, LTD.; CATLIN INSURANCE SERVICES, INC.; T.H.E. INSURANCE
COMPANY; 3M CATTLE COMPANY, LLC; and RANDY JACOBS

FILED: _____

                                    DEPUTY CLERK

**<u>ORDER</u>**

Considering the foregoing Unopposed *Ex Parte* Motion for Extension of

Time;

IT IS ORDERED that Defendant Monsanto Company be and hereby is granted an

extension of time, through and including June 10, 2019, within which to respond to Plaintiff's

Petition for Damages.

Hahnville, Louisiana this _____ day of May, 2019.

                    _____

                    JUDGE M. LAUREN LEMMON

1

1659919_1



**Disclaimer**

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast Ltd**, an innovator in Software as a Service (SaaS) for business. Providing a **safer** and **more useful** place for your human generated data. Specializing in; Security, archiving and compliance. To find out more Click Here.



# BARRASSO · USDIN · KUPPERMAN
## — FREEMAN & SARVER, L.L.C. —

Shaun P. McFall
Direct Dial: (504) 589-9764
E-Mail: smcfall@barrassousdin.com

Our File Number
0558-0023

May 3, 2019

**VIA FACSIMILE AND FEDERAL EXPRESS**

Lance Marino, Clerk of Court
29th JDC, St. Charles Parish
15045 River Road
Hahnville, LA 70057

RE: *Roland Joseph Trosclair, Jr. v. Monsanto Company, et al.*
29th JDC; Parish of St. Charles; Cause No. 86,054; Div. "D"

Dear Mr. Marino:

We are fax filing the attached (i) Request for Notice, and (ii) Unopposed *Ex Parte* Motion for Extension of Time on behalf of Monsanto Company pursuant to La. Rev. Stat. 13:850. The originals and one copy of each pleading will follow by federal express.

After we fax file these documents, we understand that your office will fax me an invoice for filing fees.

Upon your receipt of the originals, please return a conformed copy of each document to me in the enclosed, self-addressed stamped envelope.

Sincerely,

Shaun P. McFall
FOR BARRASSO USDIN KUPPERMAN
FREEMAN & SARVER, L.L.C.

SPM/kal
Enclosures

cc:  Judge M. Lauren Lemmon (w/encl.) (via email & fed ex)
     Betsy J. Barnes (w/encl.) (via email)
     Hunter W. Lundy (w/encl.) (via email)
     Matthew E. Lundy (w/encl.) (via email)

# LANCE MARINO
## CLERK OF COURT AND EX-OFFICIO RECORDER
### PARISH OF ST. CHARLES
### HAHNVILLE, LOUISIANA  70057
### PHONE:  (985) 783-6632
### FAX:  (985) 783-2005

## RECEIPT OF FACSIMILE TRANSMISSION
## ON PLEADINGS

FILED: MAY 3, 2019

SUIT NUMBER:  86,054

DIVISION: D

ROLAND JOSEPH TROSCLAIR, JR.
VS
MONSANTOCOMPANY ET AL

DEPUTY CLERK:  CYNTHIA MOLLAIRE

TO:  JUDY Y. BARASSO

For the facsimile to have the same force and effect as the original, the following must be forwarded to the Clerk of Court within seven days, exclusive of legal holidays, after the clerk of court has received the transmission.
    (1)  **The original signed document. (cannot be a computer generated signature)**
    (2)  **The applicable filing fee, if any.**
    (3)  **A transmission fee of five dollars (included in the filing fee below)**

### THE FOLLOWING MUST BE PROVIDED
**(1) Include the suit number and title on your original pleading(s).**
**(2) Include a self - addressed envelope.**
**(3) All pleadings with service must include additional copies for service.**
      **(SEE NOTE BELOW)**
**(4) Attach a copy of this transmission receipt to your original pleading(s).**

**(NOTE: TWO COPIES ARE NEEDED FOR EACH SERVICE PLUS AN ADDITIONAL COPY FOR YOUR CONFORMED COPY.  YOU WILL BE CHARGED $2.00 PER PAGE FOR COPIES IF NO SERVICE COPIES ARE PROVIDED.)**

**FILING FEES ARE DUE UPON RECEIPT OF THIS TRANSMISSION.**

FEES DUE:    $100.00      Payable to the Clerk of Court

**NOTE:  IT IS THE ATTORNEY'S RESPONSIBILITY TO NOTIFY THE JUDGES OFFICE OF ANY MOTION TO CONTINUE AND/OR RESET.**

75220102-26

**TRANSACTION REPORT**

MAY/06/2019/MON 09:40 AM

FAX(TX)

| # | DATE | START T. | RECEIVER | COM.TIME | PAGE | TYPE/NOTE | | FILE |
|---|------|----------|----------|----------|------|-----------|---|------|
| 001 | MAY/06 | 09:39AM | 5045899701 | 0:00:52 | 2 | MEMORY OK | ECM | 3985 |

## LANCE MARINO
### CLERK OF COURT AND EX-OFFICIO RECORDER
### PARISH OF ST. CHARLES
### HAHNVILLE, LOUISIANA  70057
### PHONE:  (985) 783-6632
### FAX:  (985) 783-2005

## <u>RECEIPT OF FACSIMILE TRANSMISSION</u>
## <u>ON PLEADINGS</u>

FILED: MAY 3, 2019

SUIT NUMBER:  86,054

DIVISION: D

ROLAND JOSEPH TROSCLAIR, JR.
VS
MONSANTOCOMPANY ET AL

DEPUTY CLERK:  CYNTHIA MOLLAIRE

TO: JUDY Y. BARASSO

For the facsimile to have the same force and effect as the original, the following must be forwarded to the Clerk of Court within seven days, exclusive of legal holidays, after the clerk of court has received the transmission.
   (1)  **The original signed document. (cannot be a computer generated signature)**
   (2)  **The applicable filing fee, if any.**
   (3)  **A transmission fee of five dollars (included in the filing fee below)**

### <u>THE FOLLOWING MUST BE PROVIDED</u>
(1) Include the suit number and title on your original pleading(s).
(2) Include a self - addressed envelope.
(3) All pleadings with service must include additional copies for service.
      (SEE NOTE BELOW)
(4) Attach a copy of this transmission receipt to your original pleading(s).

29TH JUDICIAL DISTRICT COURT FOR THE PARISH OF ST. CHARLES

STATE OF LOUISIANA

NO. 86,054

DIVISION "D"

ROLAND JOSEPH TROSCLAIR, JR.

VERSUS

MONSANTO COMPANY; MONSANTO COMPANY MANUFACTURING FACILITY; XL BERMUDA, LTD.; CATLIN INSURANCE SERVICES, INC.; T.H.E. INSURANCE COMPANY; 3M CATTLE COMPANY, LLC; and RANDY JACOBS

FILED: _____        _____
                                                      DEPUTY CLERK

## MONSANTO COMPANY'S REQUEST FOR NOTICE

Defendant Monsanto Company ("Monsanto"), pursuant to Louisiana Code of Civil Procedure Article 1572, moves this Court for written notice at least ten (10) days in advance of the date fixed for a trial or hearing of any exception, motion, rule, or trial on the merits in the above-captioned proceeding and, pursuant to Louisiana Code of Civil Procedure Articles 1931 and 1941, requests immediate notice of all interlocutory and final orders and judgments on any exceptions, motions, rules, or trial on the merits of the above-captioned proceeding.

Respectfully submitted,

_____
Judy Y. Barrasso, (T.A.), 2814
Celeste R. Coco-Ewing, 25002
Shaun P. McFall, 37225
BARRASSO USDIN KUPPERMAN
   FREEMAN & SARVER, L.L.C.
909 Poydras Street, 24th Floor
New Orleans, Louisiana 70112
Telephone: 504-589-9700
Facsimile: 504-589-9701
jbarrasso@barrassousdin.com
ccoco-ewing@barrassousdin.com
smcfall@barrassousdin.com

*Attorneys for Monsanto Company*

1

1659933_1

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing has been served upon all known counsel by electronic mail, facsimile and/or by United States Mail, postage prepaid and properly addressed, this 3rd day of May, 2019.

2

29TH JUDICIAL DISTRICT COURT FOR THE PARISH OF ST. CHARLES

STATE OF LOUISIANA

NO. 86,054                                                DIVISION "D"

ROLAND JOSEPH TROSCLAIR, JR.

VERSUS

MONSANTO COMPANY; MONSANTO COMPANY MANUFACTURING FACILITY; XL
BERMUDA, LTD.; CATLIN INSURANCE SERVICES, INC.; T.H.E. INSURANCE
COMPANY; 3M CATTLE COMPANY, LLC; and RANDY JACOBS

FILED: _____          _____
                                                   DEPUTY CLERK

**MONSANTO COMPANY'S**
**UNOPPOSED *EX PARTE* MOTION FOR EXTENSION OF TIME**

Defendant Monsanto Company ("Monsanto") moves for an extension of time

within which to respond to the Petition for Damages in this matter, up to and including June 10,

2019, on the following grounds:

1.

Monsanto would like to respond adequately but needs additional time to respond.

2.

The requested extension will not unduly delay the hearing or determination of this

case.

3.

Plaintiff has consented to this extension.

WHEREFORE Monsanto respectfully requests an extension of time within which

to respond to the Petition for Damages, up to and including June 10, 2019.

1

Respectfully submitted,

Judy Y. Barrasso, (T.A.), 2814
Celeste R. Coco-Ewing, 25002
Shaun P. McFall, 37225
BARRASSO USDIN KUPPERMAN
    FREEMAN & SARVER, L.L.C.
909 Poydras Street, 24th Floor
New Orleans, Louisiana 70112
Telephone: 504-589-9700
Facsimile: 504-589-9701
jbarrasso@barrassousdin.com
ccoco-ewing@barrassousdin.com
smcfall@barrassousdin.com

*Attorneys for Monsanto Company*

2

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing has been served upon all known counsel by electronic mail, facsimile and/or by United States Mail, postage prepaid and properly addressed, this 3rd day of May, 2019.

1659914_1

29TH JUDICIAL DISTRICT COURT FOR THE PARISH OF ST. CHARLES

STATE OF LOUISIANA

NO. 86,054                                                                                    DIVISION "D"

ROLAND JOSEPH TROSCLAIR, JR.

VERSUS

MONSANTO COMPANY; MONSANTO COMPANY MANUFACTURING FACILITY; XL
BERMUDA, LTD.; CATLIN INSURANCE SERVICES, INC.; T.H.E. INSURANCE
COMPANY; 3M CATTLE COMPANY, LLC; and RANDY JACOBS

FILED: _____

_____
DEPUTY CLERK

**ORDER**

**Considering the foregoing Unopposed *Ex Parte* Motion for Extension of
Time;**

IT IS ORDERED that Defendant Monsanto Company be and hereby is granted an

extension of time, through and including June 10, 2019, within which to respond to Plaintiff's

Petition for Damages.

Hahnville, Louisiana this _8th_ day of May, 2019.

_____
JUDGE M. LAUREN LEMMON

CERTIFICATE OF THE CLERK
I hereby certify that a copy of the foregoing motion
and this order has been mailed to all counsel of record
09 day of May 20 19                    J. Barrasso
by _____
Lance Marino
Clerk of Court                    w/ request
                                  w/ unopposed ex parte

1

1659919_1